UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| DIANE LACKIRAM | } |
|     Plaintiff, | } |
| | } |
| v. | }     C.A. No. 04-12592-GAO |
| | } |
| LINDA MONTMINY, PAT MCCARTHY, | } |
| FAITH KIRKLAND, ROSEMARY BEVINS, | } |
| RUTH NATHANS, LILA SARKIS, | } |
| DIANE ENOX, Deputy Commissioner of the | } |
| Massachusetts Department of Mental Retardation, | } |
| GERALD J. MORRISSEY, Commissioner of the | } |
| Massachusetts Department of Mental Retardation, | } |
| and RON PRESTON, Secretary of the | } |
| Massachusetts Office of Health and Human | } |
| Services | } |
|     Defendants. | } |

_____}

**PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS IN SUPPORT OF HER
CROSS-MOTION FOR SUMMARY JUDGMENT AND HER OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    Pursuant to L.R. 56.1, the Plaintiff hereby submits the following statement of material facts.

1. The Plaintiff, Diane Lackiram, has been employed by the Department of Mental Retardation ("D.M.R.") from 1981 through the present. Depo. Lackiram, March 15, 2005, pg. 10, attached hereto as Exhibit A.

2. In March, 2002, the Plaintiff transferred from the Fernald State School to the Hogan Resource Center ("Hogan"). Ex. A, pg. 25.

3. In January, 2003, the Plaintiff became concerned about a below-grade evaluation ("EPRS") given to an African-American employee at Hogan named Derek Jones. Ex. A, pgs. 38-39; Depo. Sarkis, May 19, 2006, pg. 27, attached hereto as Exhibit B. Jones had told the Plaintiff that he had recently written a letter to

Commissioner Gerald Morrissey regarding race discrimination at Hogan and that he believed his below-grade EPRS was retaliation for that complaint. Ex. A, pg. 73. Jones was subsequently terminated. Ex. B, pg. 76.

4. As a result of this conversation with Jones, the Plaintiff, who was a union representative as well as Derek Jones' supervisor (though she had not participated in the evaluation), requested a meeting with Defendant Nathans to inquire as to the reasons for giving this negative EPRS. Ex. A, pg. 40.

5. At that meeting, attended by Defendants Montminy, Nathans and Sarkis, Nathans told the Plaintiff that Jones' EPRS was not her concern. Ex. A, pg. 44; Ex. B, pg. 30. Jones' EPRS was subsequently amended, although it still contained a "below" mark in one category. Ex. B, pgs. 32-33; Jones EPRS, attached hereto as Exhibit C.

6. On April 17, 2003, the Plaintiff wrote a letter to Defendant Montminy regarding the Jones evaluation and other instances of racially disparate treatment and retaliation that were occurring at Hogan. Ex. A, pg. 72.

7. On April 23, 2003, the Plaintiff met with Montminy to discuss her letter. Five minutes before the meeting, Sarkis handed the Plaintiff a form which indicated that her pay was being docked for not properly documenting sick time. Five minutes after the meeting, Sarkis gave her a similar letter docking her pay for improper documentation of personal time. Ex. A, pgs. 145-46; Requests for Documentation, attached to Def. Motion at Exhibits C, F.

8. For years prior to that date, the Plaintiff had not received any type of disciplinary action involving sick or personal time. Depo. Nathans, May 19, 2006, pg. 32,

attached hereto as Exhibit D. The collective bargaining agreement requires that the employer document excessive use of sick time before a supervisor is allowed to ask employees for medical documentation to justify sick leave. Ex. B, pg. 40. Collective Bargaining Agreement, attached to Def. Motion at Exhibit D. That procedure was not followed in this case. Ex. B, pgs. 40-41. If the Defendants had documented a prior pattern of sick time abuse, such documentation would have been kept in the employee's personnel file. Ex. B, pg. 52.

9. On June 19, 2003, the Plaintiff received her bi-annual performance evaluation. No mention was made of any attendance problems. Defendant Nathans reviews all employee evaluations. Ex. D, pg. 26; Lackiram EPRS, attached to Def. Motion at Exhibit H.

10. On June 24, 2003, the Plaintiff received a phone call at work from Lisa Harrison, an investigator at D.M.R.'s Affirmative Action Office. The Plaintiff informed Harrison during that call that she intended to file a charge at the MCAD since her complaints of racial discrimination were not being adequately investigated internally. Ex. A, pg. 147.

11. Suddenly, Defendant Sarkis entered the room and told the Plaintiff that it was inappropriate for her to be making a phone call complaining about work conditions. Solely as a result of this incident, Sarkis gave the Plaintiff an informal warning for "unacceptable job performance." Ex. A, pgs. 147; 197-98; Ex. D, pgs. 28-29; Informal Warning, attached to Def. Motion at Ex. I.

12. Two days later, on June 26, 2003, the Plaintiff was told to attend a July 1 meeting regarding her "unacceptable attendance" and "unacceptable job performance." Ex. D, pg. 28; Ex. B, pg. 68.

13. Several days after the meeting, the Plaintiff was given a formal warning for "unacceptable attendance." Several of the citations on the warning were for days in which the Plaintiff was 5 to 10 minutes late. <u>See</u> Formal Warning, attached to Def. Motion at Exhibit K.

14. None of these alleged instances of tardiness or absenteeism was mentioned in the Plaintiff's EPRS issued just three weeks prior. None of these instances was alleged to have occurred between the time of the EPRS and the time the Defendants' typed the formal warning. All of the instances cited in the warning allegedly occurred after the Plaintiff complained about discrimination against Derek Jones. <u>See</u> Formal Warning, attached to Def. Motion at Exhibit K.

15. The Plaintiff subsequently took an unpaid medical leave of absence because of the severe emotional distress caused by the Defendants' actions. Ex. A, pgs. 140-141; Ex. B, pg. 81.

 

Respectfully Submitted,
Diane Lackiram
By her attorneys

DATED: July 14, 2006

//s// Michael Tumposky
Stephen Hrones
BBO No. 242860
Michael Tumposky
BBO No. 660618
Hrones, Garrity & Hedges, LLP
Lewis Wharf-Bay 232
Boston, MA 02110-3927
T) 617-227-4019

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Tumposky, hereby certify that on this the 14th of July, 2006, I have served a copy of this document, where unable to do electronically, by first-class mail to all counsel of record.

<u>//s// Michael Tumposky</u>
Michael Tumposky

10

1    A.  I had a number of jobs.  I'd have

2  to go back -- I worked at a restaurant,

3  several restaurants.  I worked at a bike

4  lock company.  I'd have to go back and

5  check my records for further information.

6    Q.  And after those jobs, was it that

7  you came to the Department of Mental

8  Health -- I'm sorry, Mental Retardation?

9    A.  Yes.

10    Q.  And that was in 1981.

11    A.  I've had several jobs while working

12  at the Fernald State School as well.

13    Q.  When you first came to work -- The

14  Fernald State School is part of the

15  Department of Mental Retardation; is that

16  correct?

17    A.  Um-hum.

18    Q.  And your first job was at the

19  Fernald School.

20    A.  No.

21    Q.  Where were you before that?

22    A.  I had several jobs; I can't tell

23  you the exact order.  I worked at

24  McDonalds.  I worked at Brigham's.  I



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE       141 Portland Street . Boston, MA 02114       EXPERIENCE YOU CAN TRUST
617.557.0039                           www.jackdanielreporting.com
                                       888.922.JACK                        FAX 617.557.0040

1    Q.  A lawyer?

2    A.  No.

3    Q.  By a union representative?

4    A.  Yes.

5    Q.  Do you recall, when was the last

6    time at the Fernald School you were

7    disciplined before it was downsized and

8    you left?

9    A.  No, I do not.

10   Q.  Okay.  Now, if I say, and I think

11   I'm correct, that the downsizing took

12   place in 2002, March of 2002, does that

13   sound right?  Do you recall when it was

14   that you left the Fernald School?

15   A.  Oh, yes.

16   Q.  Was it March of 2002?

17   A.  It was -- It was the year 2002.

18   Q.  And do you recall what month?

19   A.  I believe -- I'd have to refer to

20   my letters.

21   Q.  Okay.  And how did that come about?

22   A.  We -- I took place in a bumping

23   process, and through seniority I accepted

24   a reassignment to the Hogan Regional



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                  FAX 617.557.0040

1   with respect to Derek Jones?

2       A.   It was in 2003.

3       Q.   And what was his position?

4       A.   MRW-1.

5       Q.   And where was he located?

6       A.   One Hawthorne Circle.

7       Q.   And was -- Who was his direct

8   supervisor?

9       A.   Well, there were several

10  supervisors assigned to that building on

11  his shift.   I don't know.

12      Q.   You were not one of his direct

13  supervisors?

14      A.   When I was working in that

15  building, I was a direct supervisor to the

16  employees there.

17      Q.   And what building was that?

18      A.   One Hawthorne Circle.

19      Q.   And when were you assigned to One

20  Hawthorne?

21      A.   That -- You know, on a daily basis

22  I worked One Hawthorne Circle one day, I

23  can work One Hawthorne Circle the next and

24  I would work there for a week.   I just



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                                    FAX 617.557.0040

1  rotated.

2      Q.  Okay.  And when did Derek Jones

3  start at One Hawthorne Circle?

4      A.  I don't have that information.

5      Q.  How did Derek Jones' evaluation

6  come to your attention?

7      A.  He brought it to my attention.

8      Q.  And what did he tell you?

9      A.  He was quite upset that he received

10  a below based on a complaint from another

11  employee without it being properly

12  investigated.

13      Q.  And who had done the evaluation?

14      A.  A supervisor, the MRW-3 who works

15  first shift.

16      Q.  Who was that?

17      A.  Nikki St. Onge.

18      Q.  And was -- Did you see the

19  evaluation itself?

20      A.  Yes, I did.

21      Q.  And who else signed that

22  evaluation?

23      A.  Derek Jones and Nikki signed it,

24  and Leila Sarkis.



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
617.557.0039                    www.jackdanielreporting.com                    FAX 617.557.0040
                                888.922.JACK

44

1    A.   I wanted to know -- I wrote a

2  specific question that I did ask; why was

3  I left out of the rating and why did you

4  not come to me to support this below?

5  Because Nikki St. Onge only works first

6  shift, she was not present during this

7  time and she does not supervise Derek in

8  any way unless she's working overtime,

9  which is on a rare occasion.  And that

10  was my concern. There were other

11  supervisors there that work the second

12  shift, okay, and second shift only, that

13  give Derek Jones direct supervision.  And

14  to the best of my knowledge, they were not

15  involved in it.

16    Q.   And so your point to Ms. Nathans

17  essentially was that you should have been

18  involved and you were not involved.

19    A.   Yes.

20    Q.   And what was her response?

21    A.   She told me that was not my

22  concern, that the MRWs at One Hawthorne

23  Circle is set up for MRW-3s.

24    Q.   What did that -- you understand



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street , Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                               FAX 617.557.0040

72

1     A.   After that meeting, I submitted a

2   letter to Linda Montminy dated 4/17/03.

3   And in that document, I clearly stated

4   Derek Jones's situation and that's pretty

5   much when the retaliation really started

6   coming to surface.

7     Q.   Okay.   Okay.   Was this a document

8   entitled "Unacceptable or Unprofessional

9   Behavior"?   Well, let me strike that.

10             MR. WYZANSKI:   Let's mark

11   this as Exhibit 3.

12             (Exhibit-3, 4/17/03, Letter,

13   marked for identification).

14             (Counsel and witness

15   conferred).

16     BY MR. WYZANSKI:

17     Q.   I'm showing you what's been marked

18   as Exhibit 3 and ask you if you can

19   identify that.

20             MR. WYZANSKI:   I'm sorry.

21   I don't think I have an extra --

22             MR. TUMPOSKY:   That's fine.

23   We'll share.

24             MR. WYZANSKI:   Okay.



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
617.557.0039                          www.jackdanielreporting.com
888.922.JACK                          FAX 617.557.0040

73

1    A.  I'd like to state for the record

2  before I answer --

3    Q.  Sure.

4    A.  -- this that Derek Jones told me

5  that prior to receiving this EPRS, he had

6  written several letters to the

7  commissioner.  And as a result, he has

8  endured racial harassment and disparate

9  treatment and had actions taken against

10  him.

11    Q.  And when did you learn that?

12    A.  The same day he made the complaint

13  to me in reference to the evaluation.

14    Q.  And did you bring that to the

15  attention of Mrs. Nathans?

16    A.  Yes, I did.

17    Q.  And what was her response to that?

18    A.  Well, during that discussion, I had

19  asked Leila Sarkis are you aware that

20  Derek submitted a rebuttal to his

21  evaluation, and she said yes.  I asked her

22  did she respond.  She said no.  I asked

23  her why, and she said Derek had time off.

24  And I said, well, what about when he came



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                          888.922.JACK                          FAX 617.557.0040

140

1  pending the outcome of the review.

2      Q.  And did you report for

3  reassignment?

4      A.  No.

5      Q.  Why not?

6      A.  I have suffered a lot of stress and

7  I started having anxiety attacks.  And my

8  blood pressure -- I started having

9  elevated levels of blood pressure.

10      Q.  And when did those start?

11      A.  Well, they started prior to this.

12  It started in -- I would say, probably

13  August of 2003, I was going to my doctor

14  and I had been complaining about my back.

15  My back started all of a sudden.  I

16  started having severe back pains and neck

17  pains.  And then during our discussion, I

18  started talking and they felt that I

19  should see a physical therapist which I

20  did for two sessions of eight weeks.

21  After that, while I was at work, I

22  continued getting notices of disciplinary

23  issues, and I felt that I was being

24  harassed and I noticed that these problems



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
617.557.0039                    www.jackdanielreporting.com
                                888.922.JACK                            FAX 617.557.0040

141

1  were getting worse.

2      Q.  What disciplinary issues were you

3  getting notice of?

4      A.  You know, denial of personal leave,

5  denial of sick time, being docked, that

6  sort of stuff.

7      Q.  Attendance-related issues.

8      A.  Attendance-related issues, yes.

9      Q.  And was your attendance good at

10  that time?

11      A.  I didn't have an attendance

12  problem.

13      Q.  Did you, at all times, comply with

14  the attendance -- or the sick leave

15  policy?

16      A.  I have not seen a current sick

17  leave policy.  I know I had requested that

18  I see copies of updated policies, they're

19  so old, but I am familiar with the old

20  policies.  If I called out sick and if I

21  was asked to bring in medical

22  verification, I did.

23      Q.  Did you always bring in medical

24  verification when you were out sick and



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE      141 Portland Street . Boston, MA 02114      EXPERIENCE YOU CAN TRUST
                              www.jackdanielreporting.com
617.557.0039                  888.922.JACK                    FAX 617.557.0040

145

1    Q.  But with regard to the workplace

2  violence issue, it was not substantiated

3  and that caused you stress.

4                MR. TUMPOSKY:  Objection.

5    A.  The incident caused me stress.

6    Q.  I'm sorry?

7    A.  The incident --

8    Q.  The incident caused you stress.

9    A.  Yes.

10    Q.  Okay.  And was there anything else?

11    A.  To my stress?

12    Q.  Yes, that caused you stress.

13    A.  Harassment.

14    Q.  And what was that?  What was the

15  harassment?

16    A.  Well, I wrote a letter to Linda

17  Montminy, this document here (indicating).

18    Q.  That is Exhibit 3.

19    A.  Yes.  Five minutes before we had a

20  meeting, I believe it was on the 23rd of

21  the same month, April, Leila Sarkis handed

22  me a letter requesting sick time for two

23  days used for which I provided her a

24  doctor's note.  Five minutes after the

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
617.557.0039    www.jackdanielreporting.com    FAX 617.557.0040
888.922.JACK

146

1  meeting, she gave me a second letter

2  stating that she was denying my PL time

3  because the documentation was submitted in

4  my own handwriting and that is

5  unacceptable.

6      Q.  I'm sorry.  Denying what time,

7  personal leave time?

8      A.  Personal leave.  I had submitted a

9  letter to Ruth Nathans directly.

10      Q.  Wait a minute.  I'm sorry.  The

11  personal leave request should have been

12  typewritten or submitted --

13      A.  I don't know if it should have been

14  typewritten.

15      Q.  Okay.

16      A.  She never told me that it had to

17  be and she did not give me the opportunity

18  to do so if she wanted it in any --

19      Q.  Okay.

20      A.  -- other form.  She just said it

21  was unacceptable seven days after the fact

22  and then right on the same day that I'm

23  meeting with Linda Montminy addressing

24  discriminatory practices.



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                    888.922.JACK                                   FAX 617.557.0040

1      Q.   Yeah.   Anything else?

2      A.   On 6/24, I met with Lisa Harrison

3  and I told her that I was going to file a

4  complaint with MCAD.   At some point during

5  our discussion, Leila entered the apartment

6  and heard my conversation with Leila.   I

7  don't know -- I mean with Lisa.   I don't

8  know exactly what she heard, but after I

9  hung up the phone there was not an issue.

10  However, two days later, she came and she

11  gave me a letter saying that she wanted to

12  address my attendance and unacceptable job

13  performance.   And I was reprimanded for

14  talking with Lisa Harrison on the phone.

15  The charge is that I made a personal phone

16  call, which I did not.   I clearly stated

17  that to Leila.

18      Q.   Right.

19      A.   It was a work-related call and, in

20  fact, Lisa Harrison called me.

21      Q.   Okay.   Anything else?

22      A.   In October, I was asked to provide

23  documentation again for sick time used,

24  which I did.   The initial letter stated



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                              FAX 617.557.0040

197

1            (Exhibit-9, Informal Warning,

2  marked for identification).

3        BY MR. WYZANSKI:

4      Q.  You referred to an informal

5  warning --

6      A.  Yes.

7      Q.  -- and I'm showing you what's been

8  marked as Exhibit Number 9 and ask you

9  whether that's the informal warning to

10 which you referred.

11     A.  Yes.

12     Q.  What is it that you want to point

13 out to me there?

14     A.  Well, this informal warning is

15 based on my making a personal phone call,

16 which is incorrect.  It also states here

17 that I was complaining about the job and

18 working under these circumstances.  And

19 this is --

20     Q.  Can you read to me whatever it is

21 that you're -- the language you're

22 speaking of?

23     A.  I'm sorry?

24     Q.  Could you -- Just highlight for me





TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
617.557.0039                      www.jackdanielreporting.com
                                  888.922.JACK                              FAX 617.557.0040

198

1   the language that tells me what you're

2   saying.

3       A.   The description, the specific

4   details.

5       Q.   Okay.   Namely on --

6       A.   6/24.

7       Q.   -- 03, you were doing rounds for

8   HC.   Upon --

9       A.   It says, "Upon entering Apartment

10  H, you were outside -- you were on the

11  phone outside the kitchen and there were

12  individuals and staff present.   You were

13  making a personal phone call complaining

14  about the job and working under these

15  circumstances.   This is unacceptable.   All

16  personal phone calls are done off the

17  apartment and on your break."

18      Q.   Um-hum.

19      A.   I clearly stated to Leila that this

20  was not a personal phone call and, in

21  fact, Lisa Harrison called me.   Okay?   And

22  she proceeded to give me this informal

23  warning telling me that, you know, this

24  will come part of my personnel file if



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
617.557.0039                     www.jackdanielreporting.com
                                 888.922.JACK                              FAX 617.557.0040

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-12592-GAO

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DIANE LACKIRAM,                                           \*

      Plaintiff,                                   \*

v.                                                       \*

LINDA MONTMINY, PAT MCCARTHY, FAITH KIRKLAND,   \*

ROSEMARY BEVINS, RUTH NATHANS, LEILA SARKIS,    \*

DIANE ENOX, Deputy Commissioner of the          \*

Massachusetts Department of Mental Retardation,\*

GERALD J. MORRISSEY, Commissioner of the        \*

Massachusetts Department of Mental Retardation \*

and RON PRESTON, Secretary of the Massachusetts\*

Office of Health and Human Services,            \*

      Defendants.                                  \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF:  LEILA SARKIS

RHONES, GARRITY & HEDGES, LLP

Lewis Wharf - Bay 232

Boston, Massachusetts

May 19, 2006    10:22 a.m.

Elaine Hurley

Court Reporter

**LEILA SARKIS**
**May 19, 2006**

---

Page 2

1   APPEARANCES:
2
3   Representing the Plaintiff:
4      HRONES, GARRITY & HEDGES, LLP
5      Lewis Wharf - Bay 232
6      Boston, Massachusetts 02110
7      BY: MICHAEL L. TUMPOSKY, ESQ.
8      (617) 227-4019 FAX: (617) 227-3908
9
10  Representing Leila Sarkis:
11     COMMONWEALTH OF MASSACHUSETTS
12     Office of The Attorney General
13     One Ashburton Place
14     Boston, Massachusetts 02108
15     BY: CHARLES M. WYZANSKI, ESQ.
16     (617) 727-2200 FAX: (617) 727-3076
17
18  ALSO PRESENT:
19     Ruth Nathans
20     Faith Kirkland
21
22
23
24

---

Page 4

1   Exhibit 12, Note of June 26, 2003 ..............68
2   Exhibit 13, Notice of No Pay to Diane Lackiram ..79
3
4   (Exhibits retained by Mr. Goldman)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1             I N D E X
2
3   WITNESS          LEILA SARKIS
4
5   EXAMINATION BY:              PAGE:
6   Mr. Tumposky              5
7
8   EXHIBIT:                    PAGE:
9
10  Exhibit 1, Derek Jones's EPRS ...................30
11  Exhibit 2, Letter to Linda Montminy from
12        Diane Lackiram ........................35
13  Exhibit 3, Note for Request for Sick Time .......39
14  Exhibit 4, Memo to Diane Lackiram from
15        Leila Sarkis ..........................44
16  Exhibit 5, Handwritten Note ....................46
17  Exhibit 6, Letter to Diane Lackiram from
18        Linda Montminy .......................47
19  Exhibit 7, Letter to Diane Lackiram from
20        Leila Sarkis .........................48
21  Exhibit 8, Employee Performance Review Form .....52
22  Exhibit 9, Informal Warning ....................62
23  Exhibit 10, Formal Warning .....................63
24  Exhibit 11, Request for Documentation ...........64

---

Page 5

1            LEILA SARKIS, Deponent, having first
2   been duly sworn, deposes and states as follows:
3
4            MR. TUMPOSKY: Good morning. My name is
5   Michael Tumposky. As you probably know, I
6   represent the plaintiff, Diane Lackiram, in
7   this matter against the Department of Mental
8   Retardation. Could you just --
9            MR. WYZANSKI: Excuse me. Stipulations?
10           MR. TUMPOSKY: Yes.
11           MR. WYZANSKI: The usual, that is to
12   say, we would like to read and sign, but
13   waive the notary. All objections, except as
14   to form, are reserved until time of trial.
15           MR. TUMPOSKY: That sounds good.
16
17   EXAMINATION BY MR. TUMPOSKY:
18
19       Q.  I'm just going to ask you a few
20   questions. If you could just wait for me to finish
21   the question, and I'll wait for you to finish your
22   answer, so we're not talking over each other
23   because the court reporter has to take it down.
24           Other than that, have you had your

---

2  (Pages 2 to 5)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

<table>
<tr><td>

Page 6

1  deposition taken before?
2    A. No, I have not.
3    Q. So generally, you know, he'll object to
4  the form of the question, if he finds it
5  objectionable in some way; but you still answer the
6  question. If it comes down to it, you know, from
7  the judge, we go over the stuff if it's necessary.
8  So basically he's mainly objecting to the record,
9  and you can still answer my question unless it
10  relates to a matter of privilege, at which point
11  he'll immediately interrupt you. So other than
12  that, I think we're pretty clear on the process.
13        Could you state your name for the
14  record.
15    A. Leila Sarkis.
16    Q. Where do you live?
17    A. 6 Hoffman Ave., in Lawrence,
18  Massachusetts.
19    Q. How long have you lived there?
20    A. About eleven years.
21    Q. How old are you?
22    A. Thirty-nine.
23    Q. When did you start working for the
24  Department of Mental Retardation?

</td><td>

Page 8

1    Q. When was that?
2    A. I'd have to say possibly '95.
3    Q. After that?
4    A. RS-1 position.
5    Q. When did you attain that position?
6    A. It must have been in '97.
7    Q. Is that your current position?
8    A. No.
9    Q. What are you now?
10    A. An assistant division director.
11    Q. How many steps above RS-1 is that?
12    A. Well, it becomes a management position.
13  The others are not management positions. So I
14  wouldn't know how it would work with that.
15    Q. Did you have any titles in between RS-1
16  and your current title?
17    A. No.
18    Q. So you went right from RS-1 to your
19  current position?
20    A. Yes.
21    Q. When did you get promoted to your
22  current position?
23    A. I believe that was in '99.
24    Q. What was the title of that again?

</td></tr>
<tr><td>

Page 7

1    A. March of '87.
2    Q. What was your first position with the
3  Department?
4    A. MRW1.
5    Q. How long were you an MRW1?
6    A. I don't recall exactly. It was probably
7  less than a year because then I was in a car
8  accident and was out for a short period of time and
9  came back.
10    Q. When were you promoted to your next
11  position?
12    A. Which would have been an occupational
13  therapist assistant. It probably would have been
14  — I'm not sure exactly of the date. I'd say maybe
15  '89.
16    Q. What position did you hold subsequent to
17  that?
18    A. After that it was an MRW3 position.
19    Q. When did you obtain that position?
20    A. Again, I'm not sure of the date, but I'd
21  say roughly '92.
22    Q. When were you promoted from that
23  position?
24    A. Then I went into an MRW4 position.

</td><td>

Page 9

1    A. Assistant division director.
2    Q. What is your educational background?
3    A. I'm actually in the process of getting
4  my Bachelor's in Human Services.
5    Q. Where are you going to school?
6    A. Cambridge College.
7    Q. When do you anticipate getting that?
8    A. Hopefully next year at this time.
9    Q. Did you attend any school prior to that?
10    A. Yes. I went to Northern Essex Community
11  College for two years.
12    Q. When was that?
13    A. It was probably -- I graduated in '85,
14  so '86.
15    Q. How many years?
16    A. Roughly two years.
17    Q. So were you going to school the same
18  time you were working for the department as an
19  MRW1?
20    A. At that time, yes.
21    Q. When you were first hired as an MRW1,
22  did you undergo any training?
23    A. Yes. I'd been through the usual
24  orientation that they provide through the DMR.

</td></tr>
</table>

3  (Pages 6 to 9)

**LEILA SARKIS**
**May 19, 2006**

---

Page 10

1  Q. How long is the usual orientation?
2  A. It's either two weeks or three weeks.
3  Q. Where is it done?
4  A. Part of it was done at Hogan, and part
5  of it was done at JT Berry at that time.
6  Q. What types of topics are covered in this
7  orientation training?
8  A. From diversity to working with the
9  individuals, human rights. The hands-on part is
10 you're on the apartments, you're working with the
11 individuals, learning their behavior plans, their
12 dining needs, their ISPs. You're getting any
13 training that you would need for any of the
14 individuals that have occupational therapy,
15 recreational therapy, psychology to review their
16 behavior plans, everything that you would need to
17 know before you even start working with the
18 individual or have a base line of or know where to
19 find what you need to find.
20 Q. Of those two to three weeks, how much is
21 dedicated to topics of racial discrimination?
22 A. At that time when I was going through
23 orientation?
24 Q. Yes.

---

Page 11

1  A. I don't recall.
2  Q. Was it discussed?
3  A. Truthfully, I don't recall.
4  Q. When did you do this
5  training/orientation?
6  A. When I was hired in '87.
7  Q. So right at the first couple of weeks?
8  A. You don't start until you go through the
9  orientation.
10 Q. Since that time have you undergone
11 additional training?
12 A. Yes. We did a two-day diversity
13 training as managers.
14 Q. When was this?
15 A. I don't recall the date, but it's been
16 probably maybe three or four years.
17 Q. So it was after you were hired as — it
18 was subsequent to the time you were hired at your
19 current position?
20 A. Correct.
21 Q. A couple years after that?
22 A. Uh-huh.
23 Q. What kind of topics were discussed at
24 this two-day training?

---

Page 12

1  A. They reviewed diversity in general with
2  equal rights to everyone, assuring how you're to do
3  that. They did a lot of role plays and different
4  scenarios and how to best support staff and work
5  with staff to assure everybody is treated fairly.
6  Q. Does this training have a name, or is it
7  just called diversity training?
8  A. It's called diversity training.
9  Q. Other than the two-day diversity
10 training, have you undergone any other training
11 with respect to racial discrimination, diversity
12 and things of that sort?
13 A. Not that I can recall at this time.
14 Q. What's the English Works program?
15 A. You're referring to the program that we
16 had at Hogan, English Works program?
17 Q. Yes.
18 A. We did that as a program when we had a
19 lot of staff entering and English was a second
20 language to them. We brought someone in, and I'm
21 not well versed in that, that was something that
22 Rose worked on. I'm aware of what happened at that
23 time is that they brought in someone to help the
24 staff work with them on learning English as a

---

Page 13

1  second language and supporting them with the
2  building skills of the English language.
3  Q. Who's Rose?
4  A. Rosemary Bevins, she's the division
5  director.
6  Q. So that wasn't required for supervisors,
7  English Works?
8  A. Unless I'm understanding something else,
9  the only program that I'm aware of is it was
10 directed toward the direct care who were having
11 difficulty with English being their second
12 language.
13 Q. I see. It was for the employees who
14 couldn't speak English as their first language?
15 A. Correct.
16 Q. The two-day diversity training, was that
17 required as part of your position?
18 A. Yes.
19 Q. What is the requirement as to when that
20 is supposed to happen during the course of your
21 employment? Is there a time, every certain amount
22 of years or just once?
23 A. I don't know that.
24 Q. But it's not a requirement to become a

---

4 (Pages 10 to 13)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

Page 14

1  supervisor?
2     A.  I don't know.  I'd have to refer that to
3  the Human Resource Department on that part.  I'm
4  not sure of the time lines or with the actual --
5     Q.  After you became manager, when is the
6  first time that someone told you that you had to do
7  this training?
8     A.  The date that I was given the training
9  to take it.
10     Q.  So this would have been a couple of
11  years after you were hired as a manager?
12     A.  Uh-huh.
13     Q.  Are you familiar with the Commonwealth's
14  and/or the Department of Mental Retardation's anti-
15  discrimination policy?
16     A.  Uh-huh, yes.
17     Q.  If somebody has a complaint about racial
18  discrimination and things of that sort, what's the
19  first step in the process that they should do?
20     A.  If somebody comes to us with a
21  complaint, we refer it to the Human Resource
22  Department and Gerald Scott who covers our area
23  when it comes to any diversity issues.
24     Q.  What is his title?

Page 15

1     A.  I'm not sure exactly what his title is,
2  but he takes care of the diversity issues within.
3     Q.  Within?
4     A.  With context to Hogan anyways.
5     Q.  Is that your only role in the process,
6  you refer the complaint to higher authorities?  Is
7  that the way it goes?
8     A.  I refer it to higher authority, and
9  whatever they need for information I can either
10  give them that information or they tell me the next
11  step in what we need to do because they have to
12  fully investigate it.
13     Q.  Can you give an example what your role
14  would be if, in fact, you're told to investigate?
15     A.  Usually, I'm not told to investigate.
16  Once something is reported to me, then my
17  obligation is to give it to the proper people,
18  which is the Human Resource Department or Gerald
19  Scott.  They do the investigating part.
20     Q.  Does the investigation include, to your
21  knowledge, interviews of staff members?
22     A.  Yes.
23     Q.  Managers as well?
24     A.  If necessary, yes.

Page 16

1     Q.  Have you ever played a role in that
2  respect during an investigation of discrimination?
3     A.  Yes.
4     Q.  When was the first time that happened?
5     A.  That I was involved in something like
6  that?
7     Q.  As a witness essentially.
8     A.  I've done more of the management part of
9  it.  I haven't actually been a witness to it.  So
10  in that sense, I've either gathered information for
11  Gerry or whoever would need it and give them, you
12  know, when they can meet with people or statements
13  that people have already given me, I would turn
14  that over to him.  That's been pretty much the
15  extent of it.  Then I wait for his determination of
16  what -- now, if they're not there and they ask for
17  immediate action, I would separate the people and
18  assure that they're safe at that time.
19     Q.  When's the first time you recall acting
20  in that role as a manager during the course of
21  investigation into discrimination?
22     A.  A role in what sense?
23     Q.  When was the first time that you, as a
24  manager, participated in any way in a

Page 17

1  discrimination investigation?
2     A.  I can't recall a date because in our
3  day-to-day work there's constantly issues that come
4  up that we deal with.  Again, my role as a manager
5  is to assure that the division is safe and the
6  individuals and the staff and to make sure
7  everything at that point is referred to the people
8  that it needs to be referred to.
9     Q.  Have you ever been a party, prior to
10  this, to a lawsuit on alleging racial
11  discrimination?
12     A.  No.
13     Q.  Have you ever been a witness in any
14  lawsuit alleging racial discrimination?
15     A.  No.
16     Q.  Have you ever heard of any lawsuits,
17  other than this one, brought against the department
18  for racial discrimination?
19     A.  I have but no details.
20     Q.  You just heard a sort of rumor that
21  someone might have brought?
22     A.  Uh-huh.
23     Q.  Do you recall any of those cases?
24     A.  No.

5 (Pages 14 to 17)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

---

Page 18

```
 1      Q.  What is the racial makeup of the Hogan
 2  Resource Center percentage wise?
 3          MR. WYZANSKI:  Objection.  As to what
 4      period of time?
 5      Q.  During the years 2003 to 2004.
 6      A.  Can you repeat the question, please.
 7      Q.  Yes.  During the years 2003-2004, what
 8  was the racial makeup of the Hogan Resource Center?
 9      A.  I really wouldn't have those statistics
10  in front of me.
11      Q.  To the best of your knowledge, during
12  the years 2003 to 2004, how many African-American
13  employees were employed at the Hogan Resource
14  Center?
15      A.  I truthfully couldn't answer that
16  question.
17      Q.  To the best of your knowledge in the
18  years 2003 to 2004, how many MRW4 level employees
19  were minority?
20      A.  Just MRW4?
21      Q.  That's correct.
22      A.  To the best of my recollection I believe
23  two — three.  I'm sorry, three.
24      Q.  Who were they?
```

---

Page 19

```
 1      A.  Serge Pierre Louis.
 2      Q.  That's one person?
 3      A.  Diane Lackiram.
 4      Q.  Is Serge Pierre Louis one full name?
 5      A.  Yes.  I'm sorry.  Yes, that's one name.
 6  Diane Lackiram and Ivan Lambert.
 7      Q.  To the best of your knowledge, were any
 8  of the managerial level a minority, to the best of
 9  your knowledge?
10      A.  At Hogan?
11      Q.  Yes.
12      A.  Not to my knowledge.
13      Q.  Have you been witness or aware of any
14  conflicts between black and white employees at
15  Hogan Resource Center?
16          MR. WYZANSKI:  Objection.
17          MR. TUMPOSKY:  You can answer it.
18      A.  I can't recall at this time.
19      Q.  Do the black and white employees, to the
20  best of your knowledge based on your observations,
21  do they tend to interact, or do they tend to keep
22  to themselves?
23      A.  I think whenever you're working in an
24  environment which our staff do, which is eight
```

---

Page 20

```
 1  hours a day in an apartment together, I think that
 2  you have issues with staff that you try to work out
 3  within the facility; and if it needs to go beyond
 4  that, we direct it to that point.
 5      Q.  Now, as far as the administrative level
 6  at Hogan Resource Center, are there any African
 7  Americans in that role?
 8          MR. WYZANSKI:  Objection.
 9      A.  I don't understand.  Do you mean out of
10  the whole Hogan Regional Center?
11      Q.  Yes.
12      A.  I can only answer to where my division
13  is really.  There might be people in different
14  management roles that I'm not aware of.
15      Q.  Well, that you are aware of?
16      A.  Currently or when?
17      Q.  2003 to 2004.
18      A.  2003, I don't recall.
19      Q.  How long have you known Diane Lackiram?
20      A.  When she came over from Fernald to
21  present, I guess.
22      Q.  When was that that she came over from
23  Fernald?
24      A.  I don't recall the exact date.
```

---

Page 21

```
 1      Q.  2002?
 2      A.  I believe so.
 3      Q.  Prior to that you had no interactions
 4  with her?
 5      A.  No.
 6      Q.  When she came from Fernald, did you have
 7  any discussions with her previous supervisors
 8  regarding her?
 9      A.  No, I did not.
10      Q.  So when she came to Fernald, you knew
11  nothing about her as an employee one way or the
12  other?
13      A.  No.
14      Q.  Did you have any social interactions
15  with her during the time she was under your
16  supervision?
17      A.  What do you mean by social?
18      Q.  Outside of work.
19      A.  No.
20      Q.  What were her duties at the Hogan
21  Resource Center when she first got hired or
22  transferred?
23      A.  She worked as an MRW4.
24      Q.  What does that mean?
```

---

6 (Pages 18 to 21)

# LEILA SARKIS
## May 19, 2006

| Page 22 | Page 24 |
|---|---|
| 1    A.  I'd have to — to give in detail, I'd<br>2 have to refer to the EPRS, which breaks down what<br>3 the duties are. As for an MRW4, they're in charge<br>4 of a building or possibly two buildings to ensure<br>5 that staffing, safety, everything in that building<br>6 is run for that shift appropriately. They're also<br>7 a role model for the staff. They go in and help<br>8 staff whether it's in behaviors or supporting staff<br>9 in any fashion that's needed.<br>10    Q.  Do they have supervisory capacities?<br>11    A.  As an MRW4, yes.<br>12    Q.  Who do they supervise?<br>13    A.  The direct care on that shift.<br>14    Q.  What does that mean "direct care"?<br>15    A.  The direct care workers on that shift,<br>16 they would be responsible to assure that they're<br>17 doing their job duties.<br>18    Q.  What position, technical titles, do the<br>19 direct care employees hold?<br>20    A.  Mental Retardation Worker One.<br>21    Q.  So the MRW4s supervise MRW1s?<br>22    A.  For that shift.<br>23    Q.  For the shift that they're on?<br>24    A.  Right.  If they're the AO, which means | 1    Q.  Did you review Diane Lackiram's<br>2 personnel file when she was transferred to the<br>3 Hogan Resource Center?<br>4    A.  I don't believe initially I did.<br>5    Q.  Would that be something you'd be<br>6 authorized to do as a supervisor?<br>7    A.  As a manager, yes.<br>8    Q.  Who else would be authorized to review a<br>9 personnel file?<br>10    A.  I believe it would be managers and the<br>11 Human Resource Department.<br>12    Q.  Is it common practice to review<br>13 personnel files of employees who are coming over<br>14 from another division?<br>15    A.  Yes.<br>16    Q.  Now, what is the overtime policy for<br>17 MRW4s?  In a sense, when are they allowed to work<br>18 overtime or are required to?<br>19    A.  Basically, we don't have that much<br>20 overtime for the 4s, but whoever is the next shift<br>21 — if we know it's voluntary, ahead of time, we'd<br>22 talk within them to see who would like to do the<br>23 overtime; and if not, then the next person who is<br>24 there would have to stay mandatorily for overtime. |

| Page 23 | Page 25 |
|---|---|
| 1 administrative officer, meaning running the shift<br>2 that day.<br>3    Q.  During the time period of 2003-2004,<br>4 what shift did Diane Lackiram work on?<br>5    A.  Second.<br>6    Q.  What time is that?<br>7    A.  2:45 to 11:15.<br>8    Q.  In the afternoon?<br>9    A.  Yes.<br>10    Q.  Do you recall how many employees she<br>11 supervised during that shift?<br>12    A.  It could have been anywhere from 24 to<br>13 25 staff for that shift.<br>14    Q.  How many employees in total are there at<br>15 the Hogan Resource Center?<br>16    A.  I don't know.<br>17    Q.  That do direct care?<br>18    A.  I wouldn't have those — it's a big<br>19 building. I wouldn't have those numbers in front.<br>20 I don't know.<br>21    Q.  But it's 25 on the second shift?<br>22    A.  Right. But then you have people that<br>23 have days off; and then you have first shift, third<br>24 shift, so I'd be guessing. | 1    Q.  So at first you take volunteers and then<br>2 you do it based on reverse seniority, or how does<br>3 it work, or in order of seniority?  When does it<br>4 become — let me rephrase the question.<br>5    So first you ask for volunteers to stay<br>6 for overtime, is that the first process?<br>7    A.  If we know ahead of time, yes.<br>8    Q.  If you know that you need it, you first<br>9 ask who wants to do it?<br>10    A.  Right.<br>11    Q.  If no one volunteers, how do you decide<br>12 who does it?<br>13    A.  It would be by mandatory overtime, which<br>14 means if I'm working second shift and I'm the only<br>15 supervisor on, I would have to stay the next shift<br>16 if that was where the vacancy is.<br>17    Q.  Do you ever recall Diane Lackiram<br>18 working overtime?<br>19    A.  I don't recall.<br>20    Q.  About how often did an MRW4 need to work<br>21 overtime?<br>22    A.  Mandatorily or in general?<br>23    Q.  How often did such an occasion arise<br>24 where an MRW4 was going to be required to work |

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**LEILA SARKIS**
**May 19, 2006**

| | |
|---|---|
| **Page 26** | **Page 28** |

**Page 26**

1 overtime?
2     A. I don't think it was that often, but to
3 give actual numbers, I'd have to look back.
4     Q. What about Linda O'Brien, how often did
5 she work overtime?
6     A. I'd have to look back. I don't recall.
7     Q. What if there was a situation where you
8 needed one person to stay and two people
9 volunteered, how would you decide?
10     A. It would have to go by seniority.
11     Q. So whoever had the most seniority would
12 get to stay for the overtime?
13     A. Seniority or last date of when they did
14 an overtime.
15     Q. Which comes first?
16     A. Last date of overtime.
17     Q. So whoever did it furthest in the past
18 would get the overtime this time, is that the way
19 it worked?
20     A. So if I did overtime yesterday and
21 Charlie wanted to — both of us wanted to do
22 overtime and he had done it three days before, he
23 would get it before me.
24     Q. If it was equal in terms of when you had

**Page 27**

1 last done it, then it would be based on seniority?
2     A. Correct.
3     Q. Of the MRW4s, who had the most seniority
4 during the year 2003-2004?
5     A. I'd have to look back. I don't know.
6     Q. Do you know Diane Lackiram's seniority?
7     A. I don't.
8     Q. Now, if I can turn your attention to
9 January of 2003, there was a meeting between you,
10 Ruth Nathans, Diane Lackiram and Derek Jones; isn't
11 that right?
12     A. Correct.
13     Q. And this meeting dealt with the
14 evaluation that Derek Jones had received for the
15 year 2002, right?
16     A. Uh-huh, yes.
17     Q. At that meeting — now, by the way, what
18 position was Derek Jones?
19     A. I believe he was an MRW1.
20     Q. What shift did he work on?
21     A. Second shift, which is 2:45 to 11:15.
22     Q. At that meeting, Ms. Lackiram brought up
23 concerns that she had about Derek Jones's
24 evaluation, right?

**Page 28**

1     A. I'd have to reflect on my notes, but I
2 believe that was it.
3     Q. Do you recall what her stated concerns
4 were?
5     A. Not without reviewing my notes, I don't.
6     Q. To the best of your recollection, what
7 transpired at that meeting?
8     A. I'd have to review my notes to give you
9 accurate information on that. It's been quite a
10 while.
11     Q. What notes are these?
12     A. Reflect back to notes I had taken at
13 that time.
14     Q. Where would these notes be located?
15     A. Back at the office.
16     Q. Are these your own personal notes?
17     A. Yes, my own personal notes.
18     Q. Are these notes — have these notes been
19 provided to your attorney?
20     A. I don't remember if I provided them to
21 him or not.
22     Q. These notes were minutes of a meeting
23 between you and --
24     A. Just notes that I leave for myself so I

**Page 29**

1 recall certain conversations with staff that I
2 have.
3     Q. But essentially, she was concerned that
4 Derek Jones was given a poor evaluation because he
5 had written a letter complaining of discrimination,
6 right?
7     A. I believe so, yes.
8     Q. She felt that this evaluation in which
9 he got below grade was in retaliation for him
10 having complained about racial discrimination,
11 right?
12     A. If that's what you've read. I believe
13 that's pretty much the gist of it, yes.
14     Q. And at that time, she was told that
15 essentially wasn't her business to be getting
16 involved with Derek Jones's evaluation, right?
17     A. What she was told is that Derek Jones
18 has the union that he can go through. He was also
19 referred to Gerald Scott and other people that he
20 could talk to. As an MRW4, we really couldn't
21 review his EPRS with her because she wasn't part of
22 the union or anyone that would be privileged to
23 that. We gave Derek and Diane the proper procedure
24 they would need to go through if they had any

8 (Pages 26 to 29)

**LEILA SARKIS**
**May 19, 2006**

Page 30

1  questions regarding that matter.
2      Q. So the proper procedure would be either
3  the Union or the EEO?
4      A. Yes.
5      Q. What were specifically her concerns
6  about Derek Jones's below evaluation?
7      A. I can't recall.
8      Q. A couple of those below ratings were
9  changed at a subsequent time, weren't they?
10     A. I'd have to review it. I really don't
11  remember.
12         MR. TUMPOSKY: Can you mark this.
13
14         (Exhibit 1, Derek Jones's EPRS, marked)
15
16     Q. (By Mr. Tumposky) I'm showing you what
17  is Derek Jones's EPRS, and I'll direct your
18  attention to the one that is 2002 to 2003. Could
19  you just take some time to review that?
20     A. (Witness complying)
21     Q. Does this refresh your recollection at
22  all as to anything that happened during that
23  meeting?
24         MR. WYZANSKI: "This", meaning what?

Page 31

1      Q. The EPRS report. Does that jog your
2  memory as to the discussions regarding his below
3  evaluation?
4      A. Unless there is something specific, no.
5      Q. Does that document reflect that his
6  below evaluations, in part, were eventually changed
7  back to a meets expectations?
8      A. Well, what this says is that when my
9  MRW3 does the evaluation and then it's given to me,
10  if I find that there's an error in something, then
11  I change that and initial it and reflect the
12  change.
13     Q. So an MRW3 made that evaluation?
14     A. Yes. The MRW3s are the ones that do the
15  supervision for the EPRS with the MRW1s.
16     Q. Who was the MRW3 that did that
17  evaluation?
18     A. Nicole St. Onge.
19     Q. Subsequent to your discussions with Ms.
20  Lackiram about this evaluation, certain aspects of
21  it were changed from a below to meets expectations,
22  right?
23         MR. WYZANSKI: Objection.
24         MR. TUMPOSKY: You can still answer.

Page 32

1      A. Can you repeat the question?
2      Q. Sure. After your meeting with Ms.
3  Lackiram and Derek Jones, certain aspects of that
4  evaluation were raised from a below expectations
5  back to a meets expectations, right?
6         MR. WYZANSKI: Objection.
7      A. I don't recall if this was before or
8  after.
9      Q. Can you explain what the errors were in
10  the evaluation that caused you to change it from a
11  below in certain parts back to a meets
12  expectations?
13     A. The corrections that I made?
14     Q. Correct.
15     A. The correction that I made on changing
16  the meets to the below was in regard to a one-day
17  suspension that Derek had received on attendance.
18     Q. So that you changed from a meets to a
19  below?
20     A. Right.
21     Q. And there was something else that you
22  changed from a below to a meets?
23     A. Right.
24     Q. What was the circumstances surrounding

Page 33

1  that change?
2      A. At that point in time Derek did not have
3  any disciplinary action regarding this forum. He
4  was still working on these. There might have been
5  issues that had occurred, but he was getting
6  trained and retrained on them. That's why he would
7  get a meets and not a below. He would get a below
8  if he got some disciplinary action in that
9  category.
10     Q. That's the only circumstance in which
11  someone might be a below?
12     A. No. There might be other ones, but
13  that's the one I'm picking out right now.
14     Q. Why else would someone get a below?
15     A. It would all gear towards ongoing issues
16  with their job performance.
17     Q. Are you aware that Derek Jones later
18  brought suit against the Department of Mental
19  Retardation?
20     A. I was aware that that was happening,
21  yes.
22     Q. What's your understanding about his
23  allegations?
24     A. I really don't recall all of it right

9 (Pages 30 to 33)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

Page 34

1  now. It really wasn't part of — it was dealt with
2  the Human Resource Department on that end.
3      Q.  What do you mean by that?
4      A.  Meaning that when it gets to that point
5  of a lawsuit, all I get pulled in is to get my part
6  in a situation; and they deal with the rest of the
7  information there. I wouldn't have the full --
8      Q.  Who did you tell your part to?
9      A.  Either Faith Kirkland at that time,
10  which is part of the Human Resource Department.
11      Q.  What did you tell her regarding that?
12      A.  I don't recall. I'd have to have the
13  statements in front of me.
14      Q.  What statements are these?
15      A.  Of anything that would have been talked
16  about at that time.
17      Q.  The statements of whom? You said you
18  need these statements. What statements?
19      A.  What I'm saying is if there was anything
20  asked of me at that time, I would have to refer
21  back to what Human Resources had for notes or what
22  I would have given them, if I did, at that time,
23  anything. I don't recall.
24      MR. TUMPOSKY: Can you mark this,

Page 35

1  please.
2
3      (Exhibit 2, Letter to Linda Montminy
4      from Diane Lackiram, marked)
5
6      Q.  (By Mr. Tumposky)  I'm showing you a
7  letter to Linda Montminy from Diane Lackiram.
8  Could you take a moment to review that.
9      A.  (Witness complying)
10      Q.  Your name is mentioned in that letter,
11  right?
12      A.  Yes.
13      Q.  So after Linda Montminy received it she
14  discussed it with you, right?
15      A.  Possibly. I don't recall at this point
16  what would have been discussed.
17      Q.  You've seen that letter before though?
18      A.  Yes.
19      Q.  And in that letter Ms. Lackiram
20  discusses what she feels is some discriminatory
21  treatment based on race going on at the Hogan
22  Resource Center, right?
23      A.  Correct.
24      Q.  And she was concerned that there were

Page 36

1  some inconsistent applications of department policy
2  being directed toward African-American employees,
3  right?
4      MR. WYZANSKI: Objection.
5      A.  According to her statements here?
6      Q.  That was her statement, correct.
7      A.  According to her statements here, yes.
8      Q.  And you discussed the matter with Linda
9  Montminy, right?
10      MR. WYZANSKI: Objection.
11      A.  I don't recall. I possibly did, but I
12  don't recall at this point.
13      Q.  Do you recall having a discussion with
14  her around the time of April 2003 regarding Diane
15  Lackiram?
16      A.  Possibly, yes. There was a lot of
17  discussions around all of this, but for actual
18  dates, I can't, you know --
19      Q.  Are you aware of any other complaints
20  made by Ms. Lackiram regarding racial
21  discrimination, racial preference?
22      A.  There were a couple of letters that Ms.
23  Lackiram had given us; and as a manager in the
24  division, I referred them to appropriate people

Page 37

1  which were Lisa Harris and Gerald Scott at that
2  time and the Human Resource Department.
3      Q.  When was the first letter that you
4  mentioned, when was that written?
5      A.  I'd have to look back at the letter. I
6  don't recall.
7      Q.  Approximately?
8      A.  I don't recall.
9      Q.  What were the contents of that letter?
10      A.  Again, there was a lot of letters. I'd
11  have to look and see which one. There were quite a
12  few letters that were written.
13      Q.  Would this have been in 2003?
14      A.  I don't recall the date.
15      Q.  The second one, what about that?
16      A.  I wouldn't recall the dates on any of
17  them. I'd have to look back at them.
18      Q.  And the content of the second one?
19      A.  Again, I'd have to review it.
20      Q.  When you receive a letter like this,
21  what's the proper channels that it goes through?
22      A.  I refer it to Gerald Scott and Lisa
23  Harris, who was his assistant at that time working
24  with him.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

Page 38

1     MR. WYZANSKI: Is this Lisa Harrison?
2     A.  Yes.  I'm sorry.  Harrison.
3     Q.  In fact, regarding the letter that you
4  just reviewed, there was a meeting scheduled for
5  April 23, 2003, right?
6     A.  Scheduled for?
7     Q.  Between Linda Montminy, Faith Kirkland
8  and Ms. Lackiram, right?
9     A.  I was not part of that.
10     Q.  But you knew of that meeting?
11     A.  I did not know that meeting was
12  occurring then.  I was aware of it afterwards.
13     Q.  How soon afterwards were you aware of
14  it?
15     A.  I don't recall.
16     Q.  Right afterwards?
17     A.  I don't recall.
18     Q.  Weren't you the one that told Ms.
19  Lackiram about that meeting that had been
20  scheduled?
21     A.  I truthfully don't recall it.  I
22  possibly could have.
23     Q.  It's possible.  And on April 22nd, you
24  handed Ms. Lackiram a request for documentation of

Page 39

1  sick time; isn't that right?
2     A.  It's possible.
3     MR. TUMPOSKY: Can we mark this.
4
5     (Exhibit 3, Request for Sick Time,
6     marked)
7
8     A.  Correct.
9     Q.  (By Mr. Tumposky)  That letter or note,
10  whatever you want to call it, essentially says,
11  Please provide us documentation for a sick day that
12  you called in or else you're not going to get paid.
13  Is that essentially what that says?
14     A.  Yes.
15     Q.  And you gave this to her right before
16  her meeting with Linda Montminy about racial
17  discrimination, right?
18     MR. WYZANSKI: Objection.
19     A.  I don't recall when I gave it to her.
20     Q.  Why did she need to provide you with
21  documentation of a sick day?
22     A.  Because that's part of our policy and
23  procedure of — part of facility policy and
24  procedure.

Page 40

1     Q.  So whenever anyone calls in sick, you're
2  saying you ask them for a doctor's note?
3     A.  It's not whenever somebody calls in
4  sick.  We go through channels of counseling,
5  informal, formal; and when it reaches those points
6  at those meetings, we tell them that there seems to
7  be a pattern or whatever it is and that management
8  could possibly ask for documentation when they're
9  out if needed.
10     Q.  So only when you have reason to believe
11  that they're abusing the sick policy do you then
12  require medical documentation?
13     A.  Correct.
14     Q.  And this is after you've counseled them
15  about some issues you have with their use of sick
16  time?
17     A.  Yes.
18     Q.  When did you counsel Diane Lackiram?
19     A.  I'd have to look back at the paperwork.
20     Q.  Do you recall ever counseling Diane
21  Lackiram prior to April 22nd?
22     A.  I'd have to look back at the paperwork.
23     Q.  Is there paperwork that reflects that
24  you've counseled her prior to April 22nd?

Page 41

1     A.  If I did, there would be.
2     MR. TUMPOSKY: Charlie, if there is, if
3  that could be produced.
4     MR. WYZANSKI: Okay.
5     Q.  What kind of documentation — what would
6  this documentation look like?
7     A.  We have forms that have either informal
8  or formal written on top of them, and it would list
9  their times out or whatever explanation on there.
10     Q.  So it would either be an informal or
11  formal warning, is that what we're talking about?
12     A.  Right.
13     Q.  And only after they had an informal or
14  formal warning would they then be required to
15  document sick time?
16     A.  No.  We could also ask before that if we
17  find that there's a reason, or if someone had shown
18  a pattern, or we could also ask at other certain
19  times.
20     Q.  But this is after they've been
21  counseled?
22     A.  No.  There are certain times before
23  counsel that we can ask for documentation.
24     Q.  When did you become concerned about

11 (Pages 38 to 41)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

---

Page 42

1  Diane Lackiram's use of sick time?
2      A.  I'd have to look back at the calendar of
3  the documentation.
4      Q.  She started work at Hogan in 2002,
5  right?
6      A.  Correct.
7      Q.  Do you recall — strike that.
8          You didn't counsel her at any time
9  during the year 2002, right?
10     A.  I'd have to look back at the paperwork.
11     Q.  And prior to April of 2003, you never
12 counseled her about her sick time?
13     A.  Again, I'd have to look back at the
14 paperwork as to the actual dates.
15     Q.  We're saying this paperwork is something
16 that would be reflected in her personnel file?
17     A.  Correct.
18     Q.  So if it's not there, then we can assume
19 that it, in fact, didn't happen?
20         MR. WYZANSKI:  Objection.
21     A.  That what didn't happen?
22     Q.  That there was no counseling.
23         MR. WYZANSKI:  Objection.  Is the
24 question as to her or to anyone?

---

Page 43

1          MR. TUMPOSKY:  I'm sorry.
2      Q.  If you were to find — go back and look
3  and find that there were no records of counseling,
4  then to your mind, that would mean that, in fact,
5  had not taken place?
6      A.  I guess I'm still not really clear of
7  the question.
8      Q.  Is it always documented, counseling,
9  about violation of sick policy?  Is that always
10 documented?
11     A.  For the most part, yes.
12     Q.  But not always, you're saying?
13     A.  I guess it would depend.  I'm not clear
14 as to the question.  It seems a little vague.
15     Q.  Let's put it this way:  If someone is
16 warned that they have an issue with sick time,
17 that's going to be documented, right?
18         MR. WYZANSKI:  Objection.
19     A.  It could also be verbal through a
20 supervisory meeting.  We've done it also with
21 sitting with people and advising them that their
22 sick time or their late time or whatever it is is
23 becoming a problem.
24     Q.  Would that type of verbal warning be

---

Page 44

1  documented?
2      A.  It might; it might not be.
3      Q.  Did you ever verbally warn Diane
4  Lackiram prior to April 2003 about her sick time?
5      A.  I don't remember at this point.
6      Q.  Do you remember ever verbally warning
7  her about her sick time?
8      A.  I'd have to look back at documentation.
9  I don't remember at this time.
10     Q.  But I thought you said it wasn't always
11 documented?
12     A.  I might have it back in my personal
13 notes.  I'd have to look back.
14     Q.  On April 23, 2003 — let's do it this
15 way.
16         MR. TUMPOSKY:  Can we mark this.
17
18         (Exhibit 4, Memo to Diane Lackiram
19         from Leila Sarkis, marked)
20
21     Q.  (By Mr. Tumposky)  Do you recognize
22 that?
23     A.  Yes.
24     Q.  That document reflects that on April 23,

---

Page 45

1  2003, you requested from Diane Lackiram
2  documentation of an emergency personal day, right?
3      A.  Correct.
4      Q.  This was handed to her five minutes
5  after her meeting with Linda Montminy, right?
6         MR. WYZANSKI:  Objection.
7      A.  I can only go by the date that's written
8  on there.
9      Q.  At the time you gave her this letter,
10 you knew that she had already met with Linda
11 Montminy, right?
12     A.  I don't recall if I knew that at that
13 time.
14     Q.  Explain to me why someone would need to
15 document a personal day?
16     A.  Why, because we go under the policy and
17 procedures of the facility.  That's what the
18 facility would require.
19     Q.  What kind of documentation would that
20 require?
21     A.  Would what require?
22     Q.  For documenting a personal day, what
23 would suffice as documentation?
24     A.  It would depend on the situation.

---

12 (Pages 42 to 45)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

Page 46

1      Q.  In this situation, what would she have
2  needed to produce to have her personal day allowed?
3      A.  I don't recall the reason — I don't
4  remember the reason why she stated she needed the
5  personal day.  It doesn't say that in here.  It
6  just says that it wasn't sufficient.
7          MR. TUMPOSKY: Can you mark this.
8
9          (Exhibit 5, Handwritten Note, marked)
10
11      Q.  (By Mr. Tumposky) Do you recognize
12  that?
13          MR. WYZANSKI:  I think you've given us
14      the wrong one.  This is a year later.
15          MR. TUMPOSKY: It's the wrong one.
16      Well, it's marked so I guess we can't take it
17      away.  We'll just skip that for now.
18      Q.  Would a handwritten note explaining why
19  a personal day was needed, would that suffice?
20      A.  Again, it would depend on the
21  circumstances.
22      Q.  If someone stated they had an emergency,
23  would that be sufficient?
24      A.  It would depend on the type of

Page 47

1  emergency.  For example, if somebody's car was
2  towed, you would get something from the tow
3  company.  It would depend on what the circumstances
4  would be that would be the expected documentation.
5      Q.  Well, would a note from the employee
6  herself suffice?
7      A.  No, because pretty much anybody could
8  write a note like that.  It would be difficult to
9  back something like that up.
10      Q.  So generally you wouldn't accept just an
11  explanation from the employee as to why a personal
12  day was needed?
13      A.  Again, we go on an individual basis, and
14  we'd have to look into that individually.
15          MR. TUMPOSKY: Can we mark this.
16
17          (Exhibit 6, Letter to Diane Lackiram
18          from Linda Montminy, marked)
19
20      Q.  (By Mr. Tumposky) Have you seen that
21  before?
22      A.  I don't recall this document because it
23  was sent to Ruth Nathans.  There was a lot of
24  paperwork, but this one doesn't stick in my mind.

Page 48

1      Q.  But this letter reflects that there was
2  a meeting on April 23, 2003 between Linda Montminy
3  and Diane Lackiram?
4      A.  Correct.
5      Q.  Does it refresh your recollection as to
6  this meeting in any way?
7          MR. WYZANSKI:  Objection.
8      A.  Other than what's stated there, no.  I
9  wasn't part of that meeting.
10      Q.  You're not aware of it beforehand, is
11  your testimony?
12      A.  I said I wasn't aware of it beforehand
13  or after.
14          MR. TUMPOSKY:  Can you mark this,
15      please?
16
17          (Exhibit 7, Letter to Diane Lackiram
18          from Leila Sarkis, marked)
19
20      Q.  (By Mr. Tumposky)  This is a letter that
21  you sent to Ms. Lackiram requesting documentation
22  for April 16, 2003, right?
23      A.  Correct.
24      Q.  If she didn't produce documentation by a

Page 49

1  certain date, she would be off the payroll for
2  April 16, 2003?
3      A.  Correct.
4      Q.  What kind of documentation would she
5  need in order to satisfy this request?
6      A.  She would need to bring in a note from
7  her doctor.  She's changing it from personal to
8  sick, correct, so she would need to bring in a
9  doctor's note?
10      Q.  Explaining why she had to be out?
11      A.  Correct.
12      Q.  Now, what if she was just home with a
13  cold?
14      A.  She would still have to follow that
15  procedure.
16      Q.  So you would only honor her sick days if
17  she had actually gone to the doctor, is that
18  essentially what the policy is?
19      A.  She would need a note from her doctor.
20      Q.  This document is in her personnel file,
21  right?
22      A.  Correct.
23      Q.  Any time someone is requested to produce
24  medical documentation for a sick day, that would be

13 (Pages 46 to 49)

**LEILA SARKIS**
**May 19, 2006**

Page 50

1   in their personnel file, right?
2       A.  Yes.
3       Q.  Your attorney has produced Ms.
4   Lackiram's entire personnel file to me.  I'll
5   preface my question by saying that.  Is there any
6   time prior to April 22, 2003 where you requested
7   medical documentation of sick leave from Ms.
8   Lackiram?
9       A.  I don't recall.  I'd have to look back
10  on her file.
11      Q.  But that absolutely 100 percent would be
12  in her personnel file?
13      A.  It should be.
14      Q.  Because it's written and it's cc'd to
15  the personnel file, right?
16          MR. WYZANSKI:  Objection.  Just a point
17  of clarification, is this a change from
18  personnel to medical?
19          MR. TUMPOSKY:  I'm sorry.
20          MR. WYZANSKI:  And so the relevance of
21  other documentation seems difficult to
22  understand, but that's just a point.
23      Q.  But it's a request for medical
24  documentation, right, that letter?

Page 51

1       A.  Right.  Because she's requesting to
2   change it to sick.
3       Q.  I understand that.  That document in
4   which you're requesting medical documentation is
5   cc'd to her personnel file, right?
6       A.  Correct.  Personnel file, yes.  It says
7   it right on there.
8       Q.  So what I'm getting at is any type of
9   document like that, where you're requesting an
10  employee back up their request for sick leave, that
11  type of document goes in the personnel file?
12      A.  Correct.
13      Q.  Because you want to be able to look back
14  and figure out what you requested and if they
15  satisfied that request, right?
16      A.  Correct.
17      Q.  If she had produced medical
18  documentation, then you would have granted the
19  change from personal to sick time?
20      A.  Correct.
21      Q.  So you also need to know as far as the
22  deadline that you provided as to how long she has
23  to come up with that medical documentation?
24      A.  Correct.

Page 52

1       Q.  So you're going to keep a record of each
2   time you request documentation from someone so
3   there's never any issue as to when it has to be
4   produced and in what form, right?
5       A.  Yes.
6           MR. TUMPOSKY:  Can you mark this.
7
8           (Exhibit 8, Employee Performance Review
9           Form, marked)
10
11      Q.  (By Mr. Tumposky)  When something goes
12  in an employee's personnel file, they're provided a
13  copy, right, is that the policy?
14      A.  I believe so.
15      Q.  Do you recognize that?
16      A.  Yes.
17      Q.  What is that?
18      A.  It's an EPRS, Employee Performance
19  Review Form.
20      Q.  What employee is that?
21      A.  Diane Lackiram.
22      Q.  Now, on this EPRS form there are several
23  categories of evaluation, right?
24      A.  Correct.

Page 53

1       Q.  One of those categories is attendance?
2       A.  Correct.
3       Q.  That is on — I can't find the page, but
4   for each and every one of those categories listed,
5   she has a meets expectations rating, right?
6       A.  Correct.
7       Q.  There's no mention anywhere on that EPRS
8   form about any issue with sick leave?
9       A.  Correct.
10      Q.  So based on that, you know that she
11  hadn't been formally counseled regarding her sick
12  leave based on that EPRS report, right?
13          MR. WYZANSKI:  Objection.
14      A.  Can you repeat the question, please.
15      Q.  Based on the fact that she's listed as
16  meets expectations on every category, you know that
17  she hadn't been reprimanded for her use of sick
18  leave, right, formally?
19          MR. WYZANSKI:  Objection.
20      A.  I would have to look and see where the
21  process was as to what was going on with her at
22  that time.
23      Q.  Okay.  This is June of '03.  Two months
24  prior to that you had requested that she back up a

14 (Pages 50 to 53)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

Page 54

1  sick day that she had taken off, right?
2      MR. WYZANSKI: Objection.
3      A. Uh-huh.
4      Q. But yet nowhere on — and you previously
5  testified that you request medical documentation
6  when there's been an issue in the past of abusive
7  sick time, right?
8      A. What I said is that is typically what we
9  do, but there are other times that we can ask for
10  documentation.
11      Q. Before you've even noticed a problem
12  with that employee? Say the first day they've ever
13  called out sick, technically you're allowed to ask
14  for documentation; is that what you're saying?
15      A. It could be you're starting to see a
16  pattern. It could be someone calling in on a
17  holiday. It could be in conjunction with their
18  time off. There could be different reasons why it
19  would justify us to ask for a doctor's note before
20  having done something.
21      Q. Were any of those reasons you just cited
22  applicable to April 22nd?
23      A. I don't recall. I'd have to — I don't
24  remember.

Page 55

1      Q. But it doesn't mention on this
2  evaluation anything about her having problems with
3  her sick time, right?
4      A. Correct.
5      Q. Isn't that something that if you were
6  having concerns about that you would want to have
7  it on the evaluation?
8      A. I think I'd have to look back and see
9  what stage we were at at that time when we gave her
10  her EPRS. If it was just at the stage of we're
11  saying, "Look your time is becoming an issue",
12  we're starting to ask for documentation, if we had
13  started the disciplinary track yet or not.
14      Q. But the fact that you requested
15  documentation two months prior presupposes, doesn't
16  it, that you perceived her use of sick time as a
17  problem?
18      A. For that particular time that she called
19  in it would have been a problem, or there would
20  have been a reason for asking for it.
21      Q. So prior to that, then it's fair to say
22  there hadn't been a pattern prior to April 22nd,
23  there hadn't been a pattern of abusing sick time by
24  Ms. Lackiram?

Page 56

1      A. I'd have to look back at her file.
2      Q. But this 2002 to 2003 EPRS report would
3  tell you that there hadn't been, based on this
4  document alone, and I understand you don't recall,
5  based on this document, if you're just reviewing
6  the document, this would tell you that she hadn't
7  been disciplined for use of sick time in 2002 or
8  2003?
9      MR. WYZANSKI: Objection.
10      MR. TUMPOSKY: You can answer.
11      MR. WYZANSKI: If you understand the
12  question.
13      A. It's kind of --
14      Q. Let me rephrase. Looking at this
15  document -- based on this document, it suggests
16  that in 2002 to 2003, she did not have a problem
17  with use of sick time because it's not on here?
18  You weren't at that stage --
19      MR. WYZANSKI: Let her answer the
20  question.
21      A. Again, it might not be written on here.
22  We could have been discussing at that point that
23  there have been issues, but it might not have been
24  written in here as to if it had gotten to the point

Page 57

1  where we felt it needed to be in here.
2      Q. So it hadn't gotten to the serious point
3  where it would be in the evaluation at this time is
4  what you're saying?
5      A. I would have to say so. I can't think
6  back of what my thought frame there was.
7      Q. So this would suggest to you then that
8  in 2002, there were no "serious" issues with Ms.
9  Lackiram's use of sick time?
10      A. I wouldn't say that. I'd have to review
11  her file and see where we were at that point.
12      Q. But it would certainly suggest to you
13  that she had never been formally or informal
14  reprimanded for use of sick time in 2002 and the
15  beginning of 2003?
16      A. Possibly.
17      Q. Possibly or --
18      MR. WYZANSKI: That's her answer.
19      Q. Why, if she had been, in fact,
20  reprimanded, what would be circumstances under
21  which it would not appear in the EPRS report?
22      A. I can't answer that right now.
23      MR. TUMPOSKY: Do you want a break?
24      MR. WYZANSKI: Ms. Nathans does, but I

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

---

Page 58

1 don't know about the rest of us.
2    Q.  Now, were you present at the meeting
3 during which Ms. Lackiram's performance was
4 reviewed?
5    A.  No, I was not.
6    Q.  Who was present?
7    A.  The signatures I assume that are there.
8    MR. WYZANSKI:  The document speaks for
9 itself.
10    Q.  Is part of your job description to be
11 involved in the review of EPRS forms?
12    A.  Yes.
13    Q.  Under what circumstances or to which
14 level of employee would you be involved in the
15 discussion of their EPRS, annual EPRS?
16    A.  At that time there was two assistants
17 and Ruth was the division director, and Dottie Dunn
18 and myself would review all the EPRSs and sign off
19 on them.
20    Q.  But you wouldn't necessarily be at the
21 meeting?
22    A.  If Dottie covered it, I wouldn't.  Both
23 of us would do parts.  We'd do different people.
24 We didn't do all of them together.  She would do

---

Page 59

1 certain people, and I would do certain people.
2    Q.  So if you weren't at the meeting
3 regarding this particular EPRS form, then in all
4 likelihood Dottie Dunn was present?
5    A.  That's her signature.  I would believe
6 she was.
7    Q.  Which signature are you referring to?
8    A.  The manager -- the supervisor.
9    Q.  Okay.  Now, on June sometime after the
10 EPRS report came out, you reprimanded Ms. Lackiram
11 for improper use of telephone at work, right?
12    A.  I don't know when it was, but I do
13 recall an issue with the phone, being on the phone.
14    Q.  You recall that she was on the phone and
15 you approached her and said that personal phone
16 calls shouldn't be made during working hours,
17 right?
18    A.  She was on an apartment in front of
19 individuals speaking on a personal phone call and
20 semi upset.  I did walk onto the apartment and say
21 to her this was not the time or the place to be
22 having a personal phone call in front of the
23 individuals.
24    Q.  What was she saying?

---

Page 60

1    A.  I don't recall.
2    Q.  Who were these individuals?
3    A.  Residents that live at Hogan.
4    Q.  Other employees too?
5    A.  I don't recall.
6    Q.  What did Ms. Lackiram say to you after
7 you reprimanded her?
8    A.  I don't recall.  All I recall is walking
9 in and seeing that there were individuals around,
10 her on the telephone in regards to a personal phone
11 call; and I expressed that she needed not to be on
12 the phone in front of the individuals and then I
13 left the apartment.
14    Q.  She told you that she was talking to
15 Lisa Harrison, right?
16    A.  I believe so.
17    Q.  What did you say when she told you that?
18    A.  I said I don't need to know who you're
19 speaking to, that's on a personal note.  What I
20 know is that we're working and we need to be
21 focused on the individuals.
22    Q.  So she was talking to someone from the
23 Affirmative Action office regarding perceived
24 discrimination.  Would that be a call that she

---

Page 61

1 could not make during work hours?
2    A.  It should not be made on the apartment.
3 If she needed to, she could have made arrangements
4 with the supervisor and asked to be covered or
5 whatever the situation was.  She should be able to
6 make that phone call somewhere where it's quiet and
7 confidential, that no one else is around.  That way
8 she can have confidentiality and the individuals
9 and the staff wouldn't be part of that.
10    Q.  Now, what if Lisa Harrison had called
11 her?
12    A.  Then she would get a number from her and
13 ask her if she could call her back, and that would
14 be appropriate.
15    Q.  Now, you mentioned to your supervisor
16 that you reprimanded Ms. Lackiram for the telephone
17 call, right?
18    A.  I had spoken to her about the phone
19 call, yes.
20    Q.  You mentioned this to one of your
21 supervisors, right?
22    A.  I possibly did.
23    Q.  Who was that that you mentioned it to?
24    A.  I would assume Ruth Nathans at the time.

---

16 (Pages 58 to 61)

**LEILA SARKIS**
**May 19, 2006**

---

Page 62

1    Q.  What did you tell her regarding this
2  inappropriate use of the telephone?
3    A.  Exactly what I just said.  That she was
4  on the apartment working in front of individuals
5  and staff and was on a personal phone call.  I
6  expressed to her that she needed to not be on the
7  phone and working with the individuals, and that if
8  she needed to make the phone call, then she needed
9  to find other times which were off the apartment
10  that she could do that.
11    MR. TUMPOSKY:  Can we mark this, please.
12
13    (Exhibit 9, Informal Warning, marked)
14
15    Q.  (By Mr. Tumposky) Do you recognize
16  that?
17    A.  Yes.
18    Q.  So as a result of that personal phone
19  call, she was given an informal warning?
20    A.  Correct.
21    Q.  When you spoke to Ruth Nathans about
22  this, you told her that Diane was on the phone with
23  Lisa Harrison, right?
24    A.  Possibly.

---

Page 63

1    Q.  Now, whose decision was it to give her
2  the warning?
3    A.  We spoke to the Human Resource
4  Department and were told we could go this route and
5  do an informal warning.
6    Q.  Who in the Human Resource Department are
7  you referring to?
8    A.  It was possibly Faith Kirkland or Pat
9  McCarthy at that time.  I don't recall.
10    Q.  They said that making a phone call in
11  the apartment was grounds for an informal warning?
12    A.  Due to it being in front of individuals
13  and staff and the conversation that was done at
14  that time, yes.
15    Q.  On that same day that you gave her an
16  informal warning for speaking to Lisa Harrison, you
17  also gave her a formal warning for attendance
18  issues, right?
19    MR. WYZANSKI:  Objection.
20    A.  I'd have to see those.
21    MR. TUMPOSKY:  Can you mark this.
22
23    (Exhibit 10, Formal Warning, marked)
24

---

Page 64

1    MR. WYZANSKI:  What's the same day?  Do
2  you have a date?
3    MR. TUMPOSKY:  7/11/03.
4    A.  Yes.  The date is 7/11/03, the same day.
5    Q.  (By Mr Tumposky) Two of the issues you
6  say are two full days in which she's not on the
7  payroll, right?
8    A.  Correct.
9    Q.  Those are days in which she called in
10  sick but didn't have proper documentation to back
11  that up?
12    A.  I would have to look back to see what
13  that is.
14    MR. TUMPOSKY:  Can you mark that.
15
16    (Exhibit 11, Request for Documentation,
17    marked)
18
19    Q.  (By Mr. Tumposky)  Does that document,
20  which is a request from 5/23 for documentation as
21  to 5/15, does that refresh your memory?
22    MR. WYZANSKI:  Objection.
23    A.  Yes.
24    MR. WYZANSKI:  Mr. Tumposky, could you

---

Page 65

1  in the future refer to these documents by
2  exhibit numbers?
3    MR. TUMPOSKY:  Sure.  What is that, 11?
4    MR. WYZANSKI:  Yes.  Just for the
5  record.
6    MR. TUMPOSKY:  No problem.
7    Q.  On July 11, after the informal warning
8  for speaking to Lisa Harrison, she was given a
9  formal warning for her attendance issues, right?
10    A.  Correct.
11    Q.  According to Exhibit 11?
12    A.  Uh-huh.
13    MR. WYZANSKI:  Exhibit 10.
14    Q.  10, sorry.  Two of the days, as we just
15  discussed, are for sick days that she wasn't able
16  to document, right?
17    A.  Yes.
18    Q.  That would be April 16th and May 15th?
19    A.  According to this, yes.
20    Q.  The rest of the days are for tardiness?
21    A.  Correct.
22    Q.  On 5/22/03, she was five minutes late?
23    A.  Correct.
24    Q.  Is there a time clock that you punch

---

17  (Pages 62 to 65)

**LEILA SARKIS**
**May 19, 2006**

| Page 66 |
|---|
| 1   into at Hogan Resource Center? |
| 2     A.   We don't have a punch-in system, no. |
| 3     Q.   So how do you know if someone is five |
| 4   minutes late? |
| 5     A.   The staff and supervisor all come in to |
| 6   one room and the supervisor in that room, there's a |
| 7   clock in that room where they refer to it. |
| 8     Q.   Who is that person? |
| 9     A.   The supervisor that's in charge of that |
| 10   shift. |
| 11     Q.   So whoever it is that day marks people |
| 12   down as being late? |
| 13     A.   That would be in charge of the shift, |
| 14   correct. |
| 15     Q.   Was Diane Lackiram ever the supervisor? |
| 16     A.   At times, yes. |
| 17     Q.   Who else played that role? |
| 18     A.   It could have been Donna Woollet. It |
| 19   could have been Lee Codens. It could have been any |
| 20   of my supervisors. |
| 21     Q.   How many are there? |
| 22     A.   There are I believe six MRW4s and the 3s |
| 23   also would play a role sometimes if the 4 isn't |
| 24   there running a shift. |

| Page 67 |
|---|
| 1     Q.   So it's other MRW4s? |
| 2     A.   Correct. |
| 3     Q.   It's people that are equal in job title |
| 4   to Ms. Lackiram that would be monitoring who was |
| 5   late? |
| 6      MR. WYZANSKI: Objection. She said or |
| 7   3. |
| 8     Q.   Equal or less. |
| 9     A.   Correct. |
| 10     Q.   One of those persons was Donna Woollet? |
| 11     A.   Yes. |
| 12     Q.   Is that the same woman who accused Ms. |
| 13   Lackiram of workplace violence in October of 2003, |
| 14   right? |
| 15      MR. WYZANSKI: Objection. |
| 16     Q.   October of 2004 -- March of 2004. |
| 17   Sorry. |
| 18      MR. WYZANSKI: Objection. |
| 19     A.   I can't recall the date. It's difficult |
| 20   on both ends it seems. |
| 21      MR. WYZANSKI: In other words, it hadn't |
| 22   yet happened, so she couldn't quite recall |
| 23   what hadn't yet happened. |
| 24      MR. TUMPOSKY: Fair enough. We'll mark |

| Page 68 |
|---|
| 1     this as Exhibit 12, which is a note on June |
| 2   26, 2003. |
| 3   |
| 4      (Exhibit 12, Note of June 26, 2003, |
| 5      marked) |
| 6   |
| 7     Q.   This you delivered to Ms. Lackiram on |
| 8   June 26, 2003, right? |
| 9     A.   I don't know the exact date I delivered |
| 10   it. |
| 11     Q.   Well, it's dated June 26, 2003, let's |
| 12   put it that way, right? |
| 13     A.   Right. |
| 14     Q.   Which would be two days after the phone |
| 15   call that Diane made to Lisa Harrison, right? |
| 16     A.   Is that the date that the phone call was |
| 17   made — the phone call was made on the 24th, |
| 18   correct. |
| 19     Q.   Two days after that you cited her or you |
| 20   told her there was going to be a meeting to discuss |
| 21   her unacceptable attendance and her unacceptable |
| 22   job performance, right? |
| 23     A.   Correct. |
| 24     Q.   Now, just to refresh my memory, when was |

| Page 69 |
|---|
| 1   the EPRS report written for that year? |
| 2     A.   June 19, '03 according to the EPRS. |
| 3     Q.   So in one week she went from meets |
| 4   expectations to unacceptable attendance, |
| 5   unacceptable job performance? |
| 6      MR. WYZANSKI: Objection. |
| 7     A.   I don't understand the question. |
| 8     Q.   Okay. June 19th -- |
| 9     A.   I mean, you're stating a fact. |
| 10     Q.   Fair enough. On June 19th, she gets an |
| 11   EPRS report, right? |
| 12     A.   Right. |
| 13     Q.   It says meets expectations as to every |
| 14   category? |
| 15     A.   Right. |
| 16     Q.   One week later after a phone call to |
| 17   Lisa Harrison, she gets a letter from you saying |
| 18   there's going to be a meeting about your |
| 19   unacceptable attendance and unacceptable job |
| 20   performance? |
| 21      MR. WYZANSKI: Objection. |
| 22     Q.   Right. |
| 23      MR. WYZANSKI: Objection. |
| 24      MR. TUMPOSKY: She can answer. |

18 (Pages 66 to 69)

**LEILA SARKIS**
**May 19, 2006**

Page 70

1    A.   The facts are right in front of us.
2        MR. WYZANSKI:   And it's certainly not a
3    week.
4        MR. TUMPOSKY:   June 19th to June 26th?
5        MR. WYZANSKI:   June 14th, I think it
6    was.
7    A.   It is the 19th.
8        MR. WYZANSKI:   It is the 19th, okay.
9    Excuse me.
10   Q.   Well, what changed in that week?
11   A.   Obviously, there was an inappropriate
12   phone call made on an apartment, regardless of who
13   the person was she was talking to, in front of
14   individuals.  So that was the difference from
15   there.
16   Q.   So that's job performance?
17   A.   Correct.
18   Q.   And attendance?
19   A.   Attendance, there must have been — I'd
20   have to look at the whole picture of what was going
21   on at that time, but obviously it would have met
22   that at that point.  It looked like we needed to
23   have a meeting to do an informal.
24   Q.   Now, referring back to the formal

Page 71

1    warning, which I believe is Exhibit 10, none of the
2    dates there fall between June 19th to June 26,
3    2003, right, none of the dates here on the formal
4    warning?  You have it right there.
5    A.   Right, but can you repeat the question?
6    Q.   Sure.  None of the dates on the formal
7    warning in which she's cited for attendance issues,
8    none of those dates are between June 19th and June
9    26, 2003?
10   A.   The last date is 7/11.
11   Q.   Right.
12   A.   Between that week you're saying?
13   Q.   Right, between that week.
14   A.   No, because it's the 18th and then to
15   the 9th.
16   Q.   So it's fair to say then that there were
17   not any attendance issues between June 19th and
18   June 26, 2003?
19   A.   Looking at this I would have to say no.
20   Q.   So on June 19, 2003 she gets the EPRS
21   report which meets expectations, right?
22   A.   Correct.
23   Q.   At that time you knew about all these
24   attendance issues that she had been marked down for

Page 72

1    between 2/7/03 and 6/18/03, right?
2    A.   I can't say that because it would depend
3    on when I reviewed her calendar.
4    Q.   How often —
5    A.   I review a calendar when I see that
6    there's an issue of people coming in late and it
7    becomes a pattern.  Then I go and review their
8    calendars to see how often.
9    Q.   How far back do you go on the calendar?
10   A.   That would depend.
11   Q.   On what?
12   A.   On the circumstances, how long the
13   employee has been with us, if they've had any — it
14   would depend.
15   Q.   Say someone had been with you a year and
16   a half, would you go back and review the entire
17   year and a half?
18   A.   I would say more towards the six-month
19   frame, but you could look at the whole calendar.
20   Q.   Did you look at Diane's entire calendar
21   when you wrote out that formal warning?
22   A.   I would assume I did.
23   Q.   So the only problems you noticed were
24   problems that occurred after February 7, 2003?

Page 73

1        MR. WYZANSKI:   Objection.
2    A.   Can you repeat the question?
3    Q.   Based on the fact that you reviewed her
4    entire calendar from the time she'd been at Hogan,
5    you then only put down incidents that occurred
6    February 2003 or later, right?
7    A.   The reason why I hesitated is that I
8    know there was accommodations that we had done in
9    between that time also for Ms. Lackiram.
10   Q.   What do you mean by that?
11   A.   We had given her accommodations for
12   coming in late for different needs that she
13   expressed to us.
14   Q.   What kind of needs were those?
15   A.   I don't recall.  I'd have to go back to
16   her letters that she had written us.  They'd be in
17   her file.
18   Q.   So she was given permission to have some
19   flextime essentially?
20   A.   Correct.
21   Q.   Come in late, stay late?
22   A.   Right.  So we were very flexible when
23   she came to us and asked us for those requests.
24   Q.   Did those requests have a time frame on

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

Page 74

1 them, like for the next few months I'd like some
2 flextime or was it just in general?
3 A. I'd have to refer back. Any of it would
4 have been in writing that we would have agreed to
5 accommodate her on.
6 Q. When did those — for what time period
7 are we talking about here?
8 A. I'd have to look back at the letters
9 because there was a couple of them. I don't recall
10 the time frames.
11 Q. Would she need to document each and
12 every time that she took advantage of the
13 accommodation, or was that a generally accepted
14 thing that she did?
15 A. If she needed a short-term
16 accommodation, she would give us a letter asking
17 for the accommodation, the reason for it and how
18 long she would need the accommodation. We would
19 then, in turn, return a letter to her explaining
20 that it's accepted, not accepted and the time
21 frames of when it would be over. If she wanted to
22 extend it for any reason, she would have to give us
23 another letter expressing that she would want that.
24 Q. What kind of reasons does she provide

Page 75

1 for wanting these accommodations?
2 A. I would really have to go back and look
3 at her letters.
4 Q. What type of reasons would someone
5 provide you that you would honor for these types of
6 accommodations?
7 A. There's a variety. There's school, but
8 whatever it would be, it would be for a short
9 period of time.
10 If we're going to be much longer, I'd
11 like to take a break.
12 MR. WYZANSKI: Well, let's see how much
13 longer.
14 MR. TUMPOSKY: A half hour maybe.
15 MR. WYZANSKI: Okay. Should we take a
16 break for five minutes?
17 THE WITNESS: I do have to use the
18 ladies room.
19 MR. TUMPOSKY: Okay. Let's take a quick
20 break.
21
22 (A break was taken)
23
24 MR. TUMPOSKY: Okay. Let's go back on.

Page 76

1 Q. (By Mr. Tumposky) Did you review any
2 documents in the time that we were on break?
3 A. No.
4 Q. Let's first touch on one issue. Derek
5 Jones, when was he terminated?
6 A. I don't recall.
7 Q. Do you recall any discussions with Diane
8 Lackiram about Derek Jones's termination?
9 A. I don't recall.
10 Q. Do you recall any discussions with
11 anyone about Derek Jones's termination?
12 A. Once he was gone, that was all handled
13 through the Human Resource Department.
14 Q. Why was he terminated, if you know?
15 A. I don't recall exactly.
16 Q. About approximately?
17 A. I truthfully don't remember unless —
18 it's been a while.
19 Q. Now, in October of 2003, Ms. Lackiram
20 was accused of workplace violence, right?
21 A. If that's the date you're saying, yes, I
22 guess.
23 Q. At some point at the end of 2003, she
24 was accused of workplace violence?

Page 77

1 A. I believe so.
2 Q. Are you familiar with the allegations of
3 that incident?
4 A. Not off the top of my head, no.
5 Q. Are you a part of any investigation into
6 allegations of workplace violence?
7 A. Pertaining to myself?
8 Q. No, I'm sorry. Were you part of this
9 allegation against Ms. Lackiram?
10 A. I'd have to look back at documentation.
11 I don't recall.
12 Q. Is that part of your job description at
13 Hogan, to be involved in workplace violence
14 investigations?
15 A. If I was the manager involved at that
16 time, I would give the appropriate information to
17 Gerald Scott, Human Resource Department, the people
18 that would need to act on it.
19 Q. So your main job would be just to refer
20 the matter, is that what you're saying?
21 MR. WYZANSKI: Objection.
22 Q. In other words, you weren't directly
23 involved in the investigations; it was mainly
24 conducted by other managers?

20 (Pages 74 to 77)

**LEILA SARKIS**
**May 19, 2006**

Page 78

1    A.  Correct.
2    Q.  Who was that?
3    A.  Again, once I refer it to Gerry Scott
4  and the Human Resource Department it would be there
5  on that end.
6    Q.  Did you do any interviews with anyone
7  about the allegations in late 2003 against Ms.
8  Lackiram?
9    A.  I'd have to look back at documents.  I
10 don't recall.
11   Q.  Now, we keep hearing about these
12 documents.  What documents are we talking about?
13   A.  If there would have been anything that
14 would have happened at that time, if it came to my
15 -- if I had managed anything, either the documents
16 would have been sent over or there would have been
17 write-ups or whatever at that time of the
18 situation.
19   Q.  So when you say documents, you mean
20 things like witness statements?
21   A.  Right.  If somebody was writing up a
22 formal complaint.
23   Q.  These are documents that you had written
24 yourself or that would have been given to you by

Page 79

1  someone else?
2    A.  If someone comes and says they have a
3  complaint, they could either give it to me in
4  writing or I can refer it -- I can refer them to
5  the proper people that they need to help them, you
6  know, work it out with them.
7    Q.  What about the second allegation of
8  workplace violence, are you familiar with that?
9    A.  Which one?
10   Q.  The one of March 2004.
11   A.  I'd need more details.
12   Q.  Against Ms. Lackiram from Donna Woollet?
13   A.  This is a second one?
14   Q.  Yes.
15   A.  Again, I'd have to review the paperwork.
16 I don't recall.
17   Q.  So you have no memory one way or the
18 other about any of the allegations of workplace
19 violence?
20   A.  Not enough to give you detail.  I'd have
21 to look at and review it.
22      MR. TUMPOSKY:  Can we mark this.
23
24      (Exhibit 13, Notice of No Pay to Diane

Page 80

1      Lackiram, marked)
2
3    Q.  (By Mr. Tumposky)  Have you seen that
4  before?
5    A.  I don't recall this form itself.  I
6  could have seen it at one time or another.  Again,
7  there's a lot of information on that.  It came
8  obviously from Rosemary Bevins, who is the division
9  director at that time.
10   Q.  To the best of your knowledge, what is
11 the sick leave policy referred to in that letter?
12 What is the actual policy?
13   A.  So you're asking me for the actual
14 policy?  It's not reflected in here.
15   Q.  Right.  I'm asking you to the best of
16 your knowledge, what is the actual policy on sick
17 and family leave, I believe it's called?
18      MR. WYZANSKI:  Objection.
19   A.  I still don't understand.
20   Q.  When can someone take a day for a family
21 member being sick?
22      MR. WYZANSKI:  A brother, is that your
23      question?
24   Q.  Sure, a brother.

Page 81

1    A.  I'd have to refer it to the policy of
2  the facility.
3    Q.  Okay.  Now, at some point in the middle
4  of 2004, Ms. Lackiram went out on medical leave,
5  right?
6    A.  If that's the date, that --
7    Q.  Well, at some point — she's not there
8  now, let's put it that way?
9    A.  Right.
10   Q.  She's been out for a couple of years at
11 this point?
12   A.  Correct.
13   Q.  At any point in time after she left, did
14 you have any conversations with her?
15   A.  With Diane?
16   Q.  Yes.
17   A.  After she left meaning?
18   Q.  From her last day at Hogan going
19 forward, the entire time she was out on medical
20 leave through the present, have you had any
21 conversations with her at all?
22   A.  I don't recall.
23   Q.  Have you had any exchange of letters?
24 Have you written her letters?  Has she written you

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**LEILA SARKIS**
**May 19, 2006**

---

Page 82

1  letters at any time?
2      A.  No.
3      Q.  So to the best of your recollection from
4  the time she left Hogan up until now, you haven't
5  had any contact with her?
6      A.  To the best of my recollection, no.
7          MR. TUMPOSKY:  That's it for me.
8          MR. WYZANSKI:  I have no questions.
9
10  (Deposition concluded at 12:13 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 84

1  Today's date:        June 8, 2006
2  To:                  Charles M. Wyzanski, Esq.
3  Copied to:           Michael Tumposky, Esq.
4  From:                Elaine Hurley
5  Deposition of:       Leila Sarkis
6  Taken:               May 19, 2006
7  Action:              DIANE LACKIRAM vs.
8                       LINDA MONTMINY, et. al.
9
10          Enclosed is the deposition of LEILA
11  SARKIS.  Please have Ms. Sarkis sign the enclosed
12  signature page.  If there are any errors, please
13  have her mark the page, line and error on the
14  enclosed correction sheet.  She should not mark the
15  transcript itself.  This addendum should be
16  forwarded to all interested parties.
17          Thank you for your cooperation in this
18  matter.
19
20
21
22
23
24

---

Page 83

1          COMMONWEALTH OF MASSACHUSETTS
2          I, ELAINE HURLEY, a Notary Public in and
3  for the Commonwealth of Massachusetts, do hereby
4  certify that LEILA SARKIS appeared before me, on
5  the 19th day of May, 2006 and was by me duly sworn
6  to testify to the truth and nothing but the truth
7  as to her knowledge touching and concerning the
8  matters in controversy in this cause; that she was
9  thereupon examined upon her oath and said
10  examination reduced to writing by me; and that the
11  statement is a true record of the testimony given
12  by the witness, to the best of my knowledge and
13  ability.
14          I further certify that I am not a
15  relative or employee of counsel/attorney for any of
16  the parties, nor a relative or employee of such
17  parties, nor am I financially interested in the
18  outcome of the action.
19          WITNESS MY HAND this 8th day of June,
20  2006.
21
22  Elaine Hurley        My Commission expires:
23  Notary Public        April 7, 2011
24  Today's date:        June 6, 2006

---

Page 85

1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3                C.A. No. 04-12592-GAO
4  ****************************************
5  DIANE LACKIRAM,                    *
6          Plaintiff,                 *
7  v.                                 *
8  LINDA MONTMINY, PAT MCCARTHY,        *
9  FAITH KIRKLAND, ROSEMARY BEVINS,     *
10  RUTH NATHANS, LEILA SARKIS, et. al. *
11          Defendants.                *
12  ****************************************
13
14          I, LEILA SARKIS, do hereby certify,
15  under the pains and penalties of perjury, that the
16  foregoing testimony is true and accurate, to the
17  best of my knowledge and belief.
18          WITNESS MY HAND, this    day of    ,
19  2006.
20
21          _____
22                    LEILA SARKIS
23
24

---

22  (Pages 82 to 85)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# The Commonwealth of Massachusetts
## EMPLOYEE PERFORMANCE REVIEW FORM

*Review things over and request to sign 1/16/03*

NAME: Derrick Jones                        Evaluation Year: 2002-2003

Agency: OMR                                Location/Unit: DIV I

Job Title: MRWI IHC                        Functional Title: MRWI

Supervisor: Nicole St Onge MRW3            Reviewer: Leila Sarkis AUD

The employee and supervisor should consult their EPRS Guide for a full explanation of the purpose and the process of employee performance review. Detailed instructions for completing this form are presented in the EPRS Supervisor's Guide.

---

**A Performance Planning:** Employee and supervisor meet to plan the work for the year

[X] Discuss contributing role of employee in unit      [X] Discuss and finalize the duties and criteria

Primary Job Duties and Performance Criteria: On the reverse side list the employee's primary job duties from the most current position description and the performance criteria which will be used to evaluate the employee's performance of these duties during the performance period. Copies of the reverse may be used if more space is needed.

Signatures: Derrick Jones  12/22/02   Nicole St Onge 11/15/02   Sarkis AUD V
            Employee/date              Supervisor/date            Reviewer/date
Comments attached: [ ] yes [X] no      [ ] yes [X] no             [ ] yes [X] no

---

**B Progress Review:** Employee and supervisor meet to help the employee meet criteria

[ ] Discuss progress for each duty          [ ] Assign advisory rating for each duty
[X] Assign advisory rating for overall performance

Progress Review Summary Rating: (meets)   exceeds    below
Supervisor's Comments:

*Reviewed 2/16/03*

Signatures: Derrick Jones  12/22/02   Nicole St Onge 12/22/02   Sarkis AUD 1/6/03
            Employee/date              Supervisor/date            Reviewer/date
Comments attached: [X] yes [ ] no      [ ] yes [X] no             [ ] yes [X] no

---

**C Annual Review:** Employee and supervisor meet to evaluate job performance

[X] Discuss job performance over whole year    [X] Rate performance for entire year for each duty
[X] Rate overall performance for entire year   [ ] Formulate a Development Plan at the option
                                                   of the employee–Plan attached: [ ] yes [X] no

Annual Review Summary Rating: (meets)  exceeds   below
Supervisor's Comments (explain ratings of exceeded or below expectations, unanticipated contributions, areas of improvement and unusual attendance patterns):

Supervisor: Nicole St Onge
            signature/date

*RECEIVED DEC 09 2005 HUMAN RESOURCES*

**Employee:** I [ ] agree [X] disagree with this evaluation.
Employee's Comments:
Doctor's note was provided as per request Dec 9 and 16 N.3 approval leave granted by 2nd shift A/O

Employee: Derrick Jones  10/22/03
          signature/date

**Reviewer's Determination:** On the basis of my review I have determined that the employee's rating is:

(meets)     exceeds     below
Reviewer's comments:

Reviewer: NM St Onge 4/22/03  Leila Sarkis 8/7/03
          signature/date

**Employee:** I [ ] agree [ ] disagree with the reviewer's determination. Employee's final comments:

Employee: Derrick Jones
          signature/date

**Attendance:** Number of day sick leave used ___    Number of days off the payroll ___    Number of days tardy ___

Duty 1 - MRW 1:

**Performance Criteria: (Performance is successful if:)**

Provides for the physical welfare of individual resident by maintaining a safe and clean living environment; notifying nursing staff of health related issues and performing other related assignments for the purpose of providing optimal care to the consumers/residents of Hogan/Berry.

1. Reports signs of symptoms of illness to appropriate medical personnel.
2. Maintains individuals' living areas in a clean and hygienic manner.
3. Maintains individuals' living areas in a safe condition by reporting unsafe conditions and equipment to supervisory personnel and taking necessary immediate action to resolve unsafe conditions, when possible.
4. Accurately completes individual client "accident and injury" reports according to facility guidelines.
5. Assures that individuals are appropriately dressed and well groomed at all times.

   Including:
   - Weather conditions
   - ADL's i.e.; cleanliness, shaving, toothbrushing, hairbrushing, showered
   - Age appropriateness
   - Style
   - One's own clothes: individual's preferences must be considered whenever possible

6. Provides other related criteria to provide for the individual's physical welfare as needed.
7. Demonstrates competency in the correct use of all resident equipment, i.e. ARJO lifts, supportive protective devices, etc., to insure resident and staff safety.
8. Will use proper body mechanics in performance of duties to insure resident and staff safety i.e. lifting, restraints, etc.
9. Practices proper use of "universal precautions".

**ACTUAL PERFORMANCE:**

Progress Review: (meets)  exceeds  below
Progress Review Comments:

*Reports illness & maintains clean living areas.*

Annual Review: (meets)  exceeds  below
Annual Review Comments:

*Continues to report illnesses & maintain clean/healthy Living Environment*

---

Duty 2 - MRW 1:

**Performance Criteria: (Performance is successful if:)**

Implements Individual Service Plans by carrying out, monitoring and documenting activities of daily living, behavior, leisure and other related programs and assignments to aid the clients in developing to their full potential and maintaining accordant living routine.

1. Implements and documents objective and focuses as delineated in each Individual's ISP and completes other documentation as assigned.
2. Maintains assigned groups, normalized living routine by carrying out each individual's "Daily Activity Schedule"; including ISP objectives and leisure programming.
3. Attends and participates in dorm team meeting, annual reviews and other meetings as assigned.
4. Completes data as specified in each service agreement and delivery.

**ACTUAL PERFORMANCE:**

Progress Review:  meets  exceeds  below
Progress Review Comments:

*Needs to adhere to plans, BMPs, & CTPs more closely. Adheres to BMP's & CTPs (28)*

Annual Review: (meets)  exceeds  below·
Annual Review Comments:

*adheres to all said plans.*

006

**Performance Criteria: (Performance is successful if:)**

Maintains individual rights by complying with Department of Mental Retardation, Title XIX and Facility Regulations for the purpose of recognizing the rights of the individual.

1. Fulfills responsibilities as a "mandated reporter" to DPPC.
2. Promotes individual's dignity and respect during all interactions.
3. Enables each individual to participate in their own life planning to the greatest extent possible:

- Self Advocacy
- Empowerment
- Choice
- Independence
- Right to reasonable risks
- Foster human relationships

**ACTUAL PERFORMANCE**

Progress Review: (meets) exceeds below

Progress Review Comments:

*Promotes Choice & Independence*

**Annual Review:** (meets) exceeds below

**Annual Review Comments:**

*Continues to offer Choices & promote Independence*

---

**Duty 4 - MRW 1:**

**Performance Criteria: (Performance is successful if:)**

Adheres to Facility and Unit Policies and Procedures by complying with said policies for the purpose of delivering quality services to Hogan/Berry individuals and their families.

Staff will adhere to the implementation of all policies that directly affect the quality of service to Hogan/Berry individuals. These may include but are not limited to the following:

- Attendance/Staff Standards of Conduct
- Personnel policies
- Human rights policies
- Client Services policies
- Emergency procedure policies
- Title 19 sanitation policies
- Life Safety Procedures
- Reports and/or cooperates with all investigation i.e., DPPC, Unit based, DMR, 19 c.

**ACTUAL PERFORMANCE**

Progress Review: (meets) exceeds (below)

Progress Review Comments:

*attendance acceptable follows bldg. policies & emergency policies.*

*1 day suspension for abandment of post*

**Annual Review:** meets exceeds (below)

**Annual Review Comments:**

*Rec'd a 1 day suspension for unacceptable attendance*

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-12592-GAO

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DIANE LACKIRAM,                                         \*

       Plaintiff,                                      \*

v.                                                     \*

LINDA MONTMINY, PAT MCCARTHY, FAITH KIRKLAND,   \*

ROSEMARY BEVINS, RUTH NATHANS, LEILA SARKIS,    \*

DIANE ENOX, Deputy Commissioner of the          \*

Massachusetts Department of Mental Retardation,\*

GERALD J. MORRISSEY, Commissioner of the        \*

Massachusetts Department of Mental Retardation  \*

and RON PRESTON, Secretary of the Massachusetts\*

Office of Health and Human Services             \*

       Defendants.                                     \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF: RUTH NATHANS

RHONES, GARRITY & HEDGES, LLP

Lewis Wharf - Bay 232

Boston, Massachusetts

May 19, 2006    1:23 p.m.

Elaine Hurley

Court Reporter

**RUTH NATHANS**
**May 19, 2006**

---

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4    HRONES, GARRITY & HEDGES, LLP
5    Lewis Wharf - Bay 232
6    Boston, Massachusetts 02110
7    BY: MICHAEL L. TUMPOSKY, ESQ.
8    (617) 227-4019 FAX: (617) 227-3908
9
10 Representing Ruth Nathans:
11   COMMONWEALTH OF MASSACHUSETTS
12   Office of The Attorney General
13   One Ashburton Place
14   Boston, Massachusetts 02108
15   BY: CHARLES M. WYZANSKI, ESQ.
16   (617) 727-2200 FAX: (617) 727-3076
17
18 ALSO PRESENT:
19   Leila Sarkis
20
21
22
23
24

---

Page 3

1              I N D E X
2
3  WITNESS              RUTH NATHANS
4
5  EXAMINATION BY:              PAGE:
6  Mr. Tumposky                 4
7
8  EXHIBIT:              PAGE:
9
10 Exhibit 1, EPRS Report .........................24
11 Exhibit 2, Note from Leila Sarkis to
12     Diane Lackiram ......................28
13 Exhibit 3, Letter from Linda Montminy to
14     Diane Lackiram ......................28
15 Exhibit 4, Informal Warning.....................29
16 Exhibit 5, Formal Warning ......................30
17
18 (Exhibits retained by Mr. Tumposky)
19
20
21
22
23
24

---

Page 4

1         RUTH NATHANS, Deponent, having first
2  been duly sworn, deposes and states as follows:
3
4         MR. WYZANSKI: The usual stipulations as
5  previous?
6         MR. TUMPOSKY: Same as the previous
7  deposition.
8         MR. WYZANSKI: Okay.
9
10 EXAMINATION BY MR. TUMPOSKY:
11
12    Q.  Can you state your name for the record.
13    A.  Ruth Nathans.
14    Q.  Have you had your deposition taken
15 before?
16    A.  No.
17    Q.  Well, you were here this morning, so I
18 guess you have some idea of the process. Just to
19 remind you, I'll ask some questions, you answer and
20 I'll wait for you to finish; and I'd ask that you
21 wait for me just so that the court reporter can get
22 it all down.
23         If you don't understand a question,
24 please let me know, and I'll try to rephrase it.

---

Page 5

1  Your attorney will be objecting for the record, but
2  you can still answer unless he tells you not to
3  answer.
4         So given that background, where do you
5  currently live?
6    A.  Beverly, Mass.
7    Q.  How old are you?
8    A.  75.
9    Q.  How long have you lived in Beverly?
10   A.  About 45 years.
11   Q.  When did you start working for the
12 Commonwealth?
13   A.  I'm going to say '68.
14   Q.  Where did you start? What was your
15 first position?
16   A.  At the Commonwealth?
17   Q.  Yes, within the Commonwealth.
18   A.  Nursing supervisor.
19   Q.  Where was that?
20   A.  It was what they used to call One
21 Hathorne Circle or the Infirmary.
22   Q.  So at Hogan Resource?
23   A.  Yeah, it was at Hogan.
24   Q.  So you've been there for --

---

2 (Pages 2 to 5)

**RUTH NATHANS**
**May 19, 2006**

Page 6

1    A.  33 years about.
2    Q.  Are you retired?
3    A.  Yes.
4    Q.  When did you retire?
5    A.  A little over two years ago.  My last
6  date was December of '03.
7    Q.  So you were there 35 years almost?
8    A.  I guess so.
9    Q.  What was your position when you retired?
10    A.  Division director.
11    Q.  How long did you hold that position?
12    A.  Since probably the late '70s, early
13  '80s.
14    Q.  Before that, what was your position?
15    A.  Nursing supervisor.
16    Q.  That was what you came in as?
17    A.  (Witness nodding)
18    Q.  What's the general duties of a division
19  director at the Hogan Resource Center?
20    A.  It would be easier if you had the EPRS.
21  I'll try to -- you manage the unit, you recommend
22  staff to be hired.  You don't hire or fire anyone,
23  you recommend.  Your duties are basically the
24  management of the unit and making sure that it's

Page 7

1  working properly and the staff is, the clients, the
2  parents, and working with area offices.
3    Q.  So you're in charge of the day-to-day
4  operations of Hogan Resource Center?
5    A.  Of that unit, yes.
6    Q.  Which unit are you referring to?
7    A.  Well, it was One and Four at that point.
8    Q.  Which unit was Diane Lackiram in?
9    A.  Both.  It was Division Four -- Division
10  One.  You leave two years and you forget.  It was
11  Division One, and Diane was hired or she came in
12  from Fernald to Division One.
13    Q.  So you were her day-to-day supervisor
14  then?
15    A.  Yup.
16    Q.  Now, you said you don't make hiring and
17  firing decisions, but do you make disciplinary
18  decisions?
19    A.  We recommend discipline.
20    Q.  So you yourself can't give a formal
21  warning or can you?  You don't have to go through a
22  higher up to do that?
23    A.  No.  There's a procedure and we follow
24  the procedure.

Page 8

1    Q.  What's the procedure for when someone
2  may need to be disciplined for something?
3    A.  It depends.
4    Q.  Well, let's take an example of sick
5  time.  If you feel that someone is abusing sick
6  time, what's the proper procedure to follow in
7  terms of where the information goes?
8    A.  If I can remember correctly, it's been a
9  while, there's informal, formal procedures that you
10  go through.  Then you would have suspensions and
11  stuff of that sort afterwards.
12    Q.  But as far as that chain of command
13  goes, who needs to get informed before someone can
14  be given say an informal warning?
15    A.  Usually you let Human Resource know that
16  we're doing it.
17    Q.  Who is that?
18    A.  That would be Faith or Pat.
19    Q.  Can you give an informal warning without
20  informing them?
21    A.  If I remember correctly, if it was an
22  informal or formal, and I'm not sure, that we could
23  start the documentation.
24    Q.  They'd have to sign-off on it?

Page 9

1    A.  I don't think they'd have to sign-off.
2  We'd send them a copy.
3    Q.  So you could do it without their
4  permission until after the fact?
5    A.  For the informal and the formal.
6    Q.  So you could, on your own, make the
7  decision to give someone --
8    A.  If I recall it correctly.
9    Q.  That you, on your own, could make the
10  decision as whether to give someone a warning or
11  not?
12    A.  (Witness nodding)
13    Q.  For the record, you have to say yes or
14  no.
15    A.  I'm sorry, yes.
16    Q.  Without going to anyone higher than you?
17    A.  For those two.
18    Q.  For those two types of disciplinary
19  decisions?
20    A.  Yes.
21    Q.  What types of information do you gather
22  prior to giving someone an informal warning?
23    A.  Depends on what it was on.
24    Q.  For abusive sick time?

3  (Pages 6 to 9)

**RUTH NATHANS**
**May 19, 2006**

Page 10

1    A.  You would look at their time sheet.
2    Q.  Is informal warning the first step in
3  the disciplinary process?
4    A.  Informal.
5    Q.  Informal.  Is there anything below that?
6    A.  Written, no.
7    Q.  What about nonwritten?
8    A.  I'm sure people have been told.  At the
9  time I don't recollect, but I'm sure people could
10  have said that your time is looking pretty raunchy
11  or something.
12    Q.  Is it common for someone to get a verbal
13  counseling before they're given an informal
14  warning?
15    A.  There may be the verbal, then the
16  informal.  Really, it's been years, so my
17  recollection of it is poor.
18    Q.  You mean you wouldn't do the verbal
19  warning you're saying, or would you in some
20  circumstances?
21    A.  We would do it.
22    Q.  No, you yourself?
23    A.  No, not normally.
24    Q.  Who would do that?

Page 11

1    A.  One of the assistants.
2    Q.  And Leila Sarkis would be one of those
3  people?
4    A.  Uh-huh.
5    Q.  Just for the record, you have to say
6  verbal answers so the court reporter can take it
7  down.
8       Who are other people in that position?
9    A.  I had another assistant unit director.
10    Q.  That was Dottie Dunn?
11    A.  Right.
12    Q.  Prior to being hired in 1968, if you can
13  remember, did you undergo any training at that
14  time?
15    A.  There was some training, but I really
16  don't recall.
17    Q.  What about prior to your promotion to
18  division director in 1980, did you undergo any
19  training?
20    A.  I'm trying to recall.  There could have
21  been some training out of Boston.
22    Q.  Did you undergo any training on race
23  discrimination and things along that line?
24    A.  Just recently.  Before I left, they did

Page 12

1  a lot on that.
2    Q.  When was that?
3    A.  In '03, '02-'03.
4    Q.  Can you be more specific as to the time
5  frame?
6    A.  There were two-day workshops, if I
7  recall, for all managers.
8    Q.  When was this?
9    A.  In '03 or '02.  I don't remember which
10  one.
11    Q.  Would there be any document that would
12  reflect when you attended this training?
13    A.  Usually all training we have to sign in
14  on the service training sheet.
15    Q.  Now, your attorney has, pursuant to my
16  request for attendance records of all defendants at
17  any diversity training, has generously given me the
18  attendance records of every employee ever to work
19  at Hogan Resource Center.
20       MR. WYZANSKI:  Per your request.
21       MR. TUMPOSKY:  No.  I'm pretty sure it
22  was specific to the defendants.
23    Q.  Is there any way in looking through this
24  schedule that I could find where you took the

Page 13

1  diversity training?
2    A.  I should have signed something, but I
3  don't recall.
4    Q.  So there's no way in looking at this
5  that I'd be able to find where you took the
6  training?
7       MR. WYZANSKI:  Objection.  Just the
8  opposite if you want to take the time.
9    Q.  Right.  There's no way you could assist
10  me in finding this.
11    A.  Only that it was in either '02 or '03.
12    Q.  But you're absolutely certain that you
13  did undergo the two-day training?
14    A.  Yes.
15    Q.  What type of things were discussed at
16  that training?
17    A.  How to handle certain issues between
18  races, how to make it more comfortable for people.
19  It was two days, four years ago.  I really don't
20  remember.
21    Q.  Who ran the training?
22    A.  People were trained to run the training.
23  One of the trainers ran it, and I don't remember
24  names.

4 (Pages 10 to 13)

**RUTH NATHANS**
**May 19, 2006**

Page 14

1  Q. Who were some of the people who were
2  trained to run the training?
3  A. To the best of my recollection, I think
4  it was one of the people who worked in the day
5  program who was an assistant division director.
6  That's just a recall.
7  Q. Who was an assistant to the director?
8  A. He was an assistant director of the day
9  program.
10  Q. You don't remember who that was?
11  A. (Witness shaking head)
12  Q. Did you enjoy the training?
13  A. It's four years ago. Most of the
14  training's were -- I'm not sure enjoy is the word,
15  but they were useful.
16  Q. Other than those two days, did you ever
17  undergo any other training with respect to race
18  discrimination?
19  A. Not that I recall.
20  Q. Was that two-day training required?
21  A. I think it was required of everybody.
22  Q. Every manager or every employee?
23  A. Every manager at that point.
24  Q. And subsequently did every employee have

Page 15

1  to take it?
2  A. Yes.
3  Q. At that training, did they teach you
4  about the proper procedures for handling a
5  complaint of race discrimination?
6  A. I really don't remember.
7  Q. Do you know the proper procedures?
8  A. Depends on what it was.
9  Q. If someone complains, they feel --
10  A. Threatened?
11  Q. I was going to say if they feel that
12  there's some unfair treatment based on race going
13  on at the Hogan Resource Center. If they came to
14  you with that complaint, what would be the proper
15  procedure to follow?
16  A. Ask them to write up the complaint and
17  have them go see somebody at the Human Resource
18  Department who would direct them.
19  Q. And that would be Faith Kirkland?
20  A. Faith or Pat.
21  Q. So your only role then would be to have
22  them write a complaint and refer it up the chain of
23  command?
24  A. Yeah.

Page 16

1  Q. Would you take part in any
2  investigations of race discrimination?
3  A. No. That's up to the Human Resource
4  Office.
5  Q. Have you ever been a witness in any
6  cases other than this one?
7  A. No.
8  Q. A defendant?
9  A. No.
10  Q. Are you aware of any other lawsuits
11  against the Department alleging race
12  discrimination?
13  A. Only because I heard you talk this
14  morning, if that's allowed.
15  Q. Other than that one I mentioned?
16  A. No.
17  Q. Of the MRWs in the time of 2003 to 2004,
18  out of all the MRWs, how many were minority?
19  A. Three.
20  Q. Of all the MRWs?
21  A. Oh, all. I don't know.
22  Q. And of the MRW4s?
23  A. Three.
24  Q. How many worked on the shift with Diane

Page 17

1  Lackiram?
2  A. I think Diane was the only one on that
3  shift.
4  Q. How many total employees are there on
5  that shift?
6  A. You're talking about — I don't
7  understand what you mean.
8  Q. On the shift that she worked on, how
9  many other MRW employees were there working there
10  with her?
11  A. On any given night there could be up to
12  25.
13  Q. How many total in Hogan Resource Center?
14  A. I don't know.
15  Q. What about at the administrative —
16  strike that.
17     What about at the managerial level, how
18  many total managers are there at the Hogan Resource
19  Center that have supervision, one way or the other,
20  over the Hogan Resource Center?
21  A. I don't -- I'm not quite sure. Are you
22  talking at just Hogan?
23  Q. How many managers are there that you
24  either report to or that report to you?

5 (Pages 14 to 17)

**RUTH NATHANS**
**May 19, 2006**

---

Page 18

1    A.  That are what?
2    Q.  Affiliated, that have supervisory
3  capacity over Hogan Resource Center?
4    A.  Are you talking about my boss?
5    Q.  As well as the managers below you.  Yes,
6  the managers above you at Hogan and below you.  How
7  many total are there?
8    A.  Total what?  I don't think I understand
9  what you're trying to get to.
10    Q.  Okay.  There's a hierarchy, right?
11    A.  Yes.
12    Q.  It starts with the assistant division
13  director and goes up to eventually --
14    A.  Facility director would be my immediate
15  boss.
16    Q.  Who is that?
17    A.  Linda Montminy.
18    Q.  Okay.  Above her is Faith Kirkland?
19    A.  No.  Faith is Human Resources.
20    Q.  Another department.  So who's above
21  Linda Montminy?
22    A.  It used to be — they just changed it,
23  and I'm not sure.
24    Q.  Let's say 2002 to 2003.

---

Page 19

1    A.  Well, Mandy Chalmers was, but that's all
2  separated now.
3    Q.  I see.  What was her role?
4    A.  Mandy was in charge of the facility and
5  the community.
6    Q.  And above her?
7    A.  Above her?
8    Q.  Yes.  Who did she report to?
9    A.  The Commissioner.
10    Q.  How long have you known Diane Lackiram?
11    A.  Since she started in '02 was it.
12    Q.  So prior to that, you did not know her?
13    A.  No.
14    Q.  When you were told that she was being
15  transferred, did you review her personnel file?
16    A.  No.
17    Q.  Did you often review the personnel files
18  of individuals who are transferred to your unit?
19    A.  From?
20    Q.  From other Commonwealth -- in other
21  divisions of the department?
22    A.  Not normally.
23    Q.  So at the time that Ms. Lackiram began
24  working, you didn't know about any of her prior

---

Page 20

1  history?
2    A.  No, I didn't.
3    Q.  Did you have any social interaction with
4  her outside of work?
5    A.  No.
6    Q.  To the best you can describe, what were
7  her duties as an MRW4?
8    A.  Supervision of the building, making sure
9  of health and safety, making sure there was enough
10  staff on, making sure the staff was assigned.  It
11  was supervisory duties.
12    Q.  Did she supervise MRW1s?
13    A.  While she was on the shift, yes.
14    Q.  That was second shift, right?
15    A.  That was the second shift.
16    Q.  Now, turning your attention to, I
17  believe it was early February of 2003, you had a
18  meeting with Ms. Lackiram, Derek Jones and Leila
19  Sarkis, right?
20    A.  I never remember such a meeting.
21    Q.  So you were not at that meeting?
22    A.  I do not remember a meeting such as
23  that.
24    Q.  Do you recall any meetings in which

---

Page 21

1  Derek Jones's EPRS was discussed?
2    A.  No.
3    Q.  Do you recall anything about Derek
4  Jones's EPRS report that year?
5    A.  No.
6    Q.  Do you recall Ms. Lackiram ever
7  complaining about racial discrimination at Hogan
8  Resource Center?
9    A.  I remember she had some interaction with
10  Linda Montminy about it.
11    Q.  When was that?
12    A.  I don't remember.
13    Q.  To the best of your knowledge what was
14  that interaction?
15    A.  I don't remember.  I remember she had a
16  meeting with Linda about it.
17    Q.  That was in 2003?
18    A.  I really don't remember the dates.
19    Q.  Now, at one point in time around early
20  2003, you had a discussion with Diane about some
21  issues that she had at the Hogan Resource Center,
22  right?
23    A.  I don't remember having any discussion
24  with her about issues.  What issues?

---

6 (Pages 18 to 21)

**RUTH NATHANS**
**May 19, 2006**

Page 22

1    Q.  Well, she was concerned that people felt
2  -- that some of the staff members had felt
3  disrespected by the management at Hogan Resource
4  Center, right?
5    A.  I don't remember the conversation.
6    Q.  When she brought these concerns to your
7  attention, you told her that "you don't fit in",
8  right?
9    A.  I don't remember ever saying that to
10  her, and I don't think I would have.  Is there
11  documentation on those people's concerns?
12    Q.  Unfortunately --
13    MR. WYZANSKI:  No, the answer is no.
14    MR. TUMPOSKY:  Well, there wasn't a
15  question.
16    Q.  Do you feel that Diane fit in?
17    A.  I don't know what you mean by fit in.
18    Q.  Did she get along with people?
19    A.  My job was to see that she did her job.
20    Q.  Did you like her?
21    A.  I don't think it's a point of liking or
22  not liking.  I have a lot of staff there.  I don't
23  have to like or dislike them.  My big thing is that
24  people do their job, and it isn't a point of liking

Page 23

1  or not.
2    Q.  At what point did you decide she wasn't
3  doing her job?
4    MR. WYZANSKI:  Objection.
5    A.  I think basically it was more time.
6    Q.  When did that start cropping up?
7    A.  I don't remember.  You have
8  documentation, if you want to show me that.
9    Q.  Did you tell her that she was relegated
10  to the back burner when it came to supervisory
11  duties?
12    A.  No.
13    Q.  Was she doing direct care at the time?
14    A.  I don't ever remember her doing direct
15  care as a supervisor.
16    Q.  Would that be unusual if she was doing
17  direct care?
18    A.  As a supervisor?
19    Q.  Right.
20    A.  I'm not sure what that means.
21    Q.  Was she in the apartment caring for the
22  clients on a day-to-day basis?
23    A.  She was on the floor supervising the
24  clients and the staff.

Page 24

1    Q.  Is that what the other MRW4s did as
2  well?
3    A.  Diane did exactly what the other MRW4s
4  did.
5    Q.  So your testimony is that she had
6  exactly the same responsibilities as the other
7  MRW4s?
8    A.  Yes.
9    Q.  You never told her that she would get
10  the non-supervisory duties that the other
11  supervisors couldn't do?
12    A.  Never.
13    Q.  Now, on June 19, 2003 -- actually, let
14  me back up a little bit.  On June 19, 2003, Ms.
15  Lackiram got her annual or bi-annual performance
16  evaluation, right?
17    A.  Uh-huh.
18    Q.  On those performance evaluations you --
19  let me show you what I'm talking about here.
20    MR. TUMPOSKY:  Can you mark that.
21
22    (Exhibit 1, EPRS Report, marked)
23
24    Q.  (By Mr. Tumposky)  I'm showing you what

Page 25

1  we're marking as Exhibit 1 for this deposition, the
2  EPRS Report for 2002 to 2003.  Now, part of this
3  review encompasses all aspects of job performance,
4  right?
5    A.  Whatever it says here.  It spells it
6  out.
7    Q.  So if someone had a problem with
8  attendance or tardiness, that would be something
9  that would be mentioned on this evaluation, right?
10    A.  I'd have to read the evaluation and see.
11  I don't see anything that talks about time.  Am I
12  missing something?
13    Q.  Then you have a discussion with the
14  employee --
15    MR. WYZANSKI:  Is there a question?
16    MR. TUMPOSKY:  I think there was.  Can
17  you read back the last question.
18
19    (Question read back)
20
21    A.  There's nothing on the actual body.
22  It's on the bottom of C.
23    Q.  There's a section which says, a number
24  of sick leave used, a number of days off payroll, a

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**RUTH NATHANS**
**May 19, 2006**

Page 26

1  number of days tardy?
2     A.  Right.
3     Q.  And there's nothing marked?
4     A.  I'd have to go back and see what
5  happened with Diane before that time.  Off the top
6  of my head, I have not a clue.
7     Q.  But just looking at this document it
8  would appear that attendance was not an issue that
9  was brought up at her annual review on June 19th?
10     MR. WYZANSKI:  Objection.  It's not
11  filled out.
12     A.  Not filled out.
13     Q.  Not filled out.  You don't recall that
14  being brought up?
15     A.  No, I don't.
16     Q.  Were you involved in her annual review?
17     A.  I review what the assistant writes.
18     Q.  You weren't involved in the meeting?
19     A.  In the meeting, not necessarily.  I
20  could have, but I don't recall it.
21     Q.  And you reviewed this EPRS Report?
22     A.  I reviewed all the MRW4s.
23     Q.  If the reviewer had forgotten to mark
24  down poor attendance, would that be something that

Page 27

1  you would pick up on?
2     A.  Possibly.
3     Q.  Now, five days later Leila Sarkis
4  brought to your attention the fact that Diane had
5  been using the phone, making a personal phone call
6  at work, right?
7     A.  Yes.
8     Q.  Can you tell me what she told you
9  exactly?
10     A.  No.  I remember just the incident, that
11  something had happened with the phone.
12     Q.  Do you recall any more details?
13     A.  Only that Diane had been making a
14  personal phone call in front of folks.
15     Q.  Did she tell you that the call was to
16  Lisa Harrison or from Lisa Harrison rather?
17     A.  I really don't remember whether she told
18  me who it was from.
19     Q.  So that wouldn't have mattered?
20     A.  No, sorry.
21     Q.  Now, on June 26th, Diane was informed
22  that there was a meeting on July 1st to discuss her
23  unacceptable attendance and job performance, were
24  you aware of that meeting?

Page 28

1     A.  Can I see that?
2     Q.  Sure.
3     MR. TUMPOSKY:  Why don't we mark this.
4
5     (Exhibit 2, Note from Leila Sarkis
6     to Diane Lackiram, marked)
7
8     Q.  (By Mr. Tumposky)  I'm showing you what
9  we marked as Exhibit 2.  It's a note from Leila
10  Sarkis to Diane Lackiram regarding a meeting on
11  July 1st.  The notes dated 6/26/03 and the subject
12  is unacceptable attendance, unacceptable job
13  performance.
14     A.  I really don't remember the meeting.
15     Q.  Do you remember thinking at that time
16  that Diane had unacceptable attendance or
17  unacceptable job performance?
18     A.  I remember the issue of time, but I
19  really don't remember the exact issue of her time
20  or the performance.
21     MR. TUMPOSKY:  Let me back up a little
22  bit here.  Can you mark that.
23
24     (Exhibit 3, Letter from Linda Montminy

Page 29

1     to Diane Lackiram, marked)
2
3     Q.  (By Mr. Tumposky)  This is Exhibit 3, a
4  letter from Linda Montminy to Diane Lackiram and
5  cc'd to you.  Tell me if you recognize that?
6     A.  Vaguely.
7     Q.  And that letter discusses, does it not,
8  a meeting that had occurred between Diane Lackiram
9  and Linda Montminy regarding Ms. Lackiram's
10  concerns about racial discrimination?
11     A.  It says so.
12     Q.  So then at that time, you were aware
13  that she had this meeting on April 23, 2003?
14     MR. WYZANSKI:  Objection.
15     A.  I don't remember when she had the
16  meeting with Linda.  I remember the letter.
17     MR. TUMPOSKY:  Can we mark this.
18
19     (Exhibit 4, Informal Warning, marked)
20
21     Q.  (By Mr. Tumposky)  I'm showing you
22  Exhibit 4, an Informal Warning.  This is an
23  informal warning signed by both you and Leila
24  Sarkis to Diane Lackiram for unacceptable job

8 (Pages 26 to 29)

**RUTH NATHANS**
**May 19, 2006**

| Page 30 |
|---|
| 1  performance. Did you write this or did Leila |
| 2  Sarkis write this? |
| 3      A.  It's readable, Leila wrote it. |
| 4      Q.  So I assume before you signed it, you |
| 5  reviewed it? |
| 6      A.  Yes. |
| 7      Q.  And you discussed the matter with her |
| 8  before signing it? |
| 9      A.  I'm sure. |
| 10     Q.  Didn't she tell you that, in fact, it |
| 11 was a phone call from Lisa Harrison? |
| 12     A.  I thought I answered that one.  I don't |
| 13 remember who the phone call was from. |
| 14         MR. TUMPOSKY:  Can you mark this. |
| 15 |
| 16         (Exhibit 5, Formal Warning, marked) |
| 17 |
| 18     Q.  (By Mr. Tumposky)  And on that same day, |
| 19 she was given a formal warning.  Was that written |
| 20 by you? |
| 21     A.  I don't remember writing it, but I |
| 22 certainly signed it and I saw it. |
| 23     Q.  I'm sorry.  You said you don't remember |
| 24 if you wrote it or not? |

| Page 31 |
|---|
| 1      A.  No, but I certainly saw it.  My name is |
| 2  on it, so I read it. |
| 3      Q.  It says here, You have a long history of |
| 4  counseling and suspensions for overall unacceptable |
| 5  attendance.  Now, my question is why wasn't any of |
| 6  this mentioned in her annual review? |
| 7      A.  I'd have to check times.  I don't |
| 8  remember dates. |
| 9      Q.  Well, the dates listed on here, the |
| 10 majority of them, are from before her annual |
| 11 review, right? |
| 12     A.  Yes. |
| 13     Q.  So my question is why if it was an |
| 14 issue, why wasn't it mentioned on the annual |
| 15 review? |
| 16     A.  Because it probably wasn't pulled |
| 17 together until then. |
| 18     Q.  So what made you pull it together? |
| 19     A.  Probably looking at time sheets. |
| 20     Q.  But you looked at them because you were |
| 21 looking for something, you were looking for a |
| 22 problem? |
| 23     A.  As a manager, all the managers look at |
| 24 time sheets. |

| Page 32 |
|---|
| 1      Q.  How often would you look at a time |
| 2  sheet? |
| 3      A.  Sometimes every other month or so. |
| 4      Q.  So just on a regular basis you routinely |
| 5  reviewed the time of employees? |
| 6      A.  That's right, yes, or I did. |
| 7      Q.  What that tells you then is that |
| 8  sometime within the area around July 11th, you |
| 9  pulled her time sheets for the past five months? |
| 10     A.  Could be. |
| 11     Q.  But before that, you hadn't pulled her |
| 12 time sheets, right, to the best of your |
| 13 recollection? |
| 14     A.  To the best of my recollection, I don't |
| 15 know.  I really don't.  I could have pulled her |
| 16 time sheets and saw one or two things.  This is |
| 17 five months. |
| 18     Q.  But before that you never thought her |
| 19 attendance issue sufficient enough to write a |
| 20 formal warning? |
| 21     A.  I guess not.  I really don't remember. |
| 22     Q.  Under what circumstances would an |
| 23 employee be required to produce medical |
| 24 documentation to back up a sick day? |

| Page 33 |
|---|
| 1      A.  If they were using more of it or if what |
| 2  we thought was — you can ask for documentation for |
| 3  any reason and off the top of my head, I don't |
| 4  remember. |
| 5      Q.  So even if an employee hasn't had a |
| 6  problem, you would sometimes request documentation |
| 7  for a sick day? |
| 8      A.  It would depend. |
| 9      Q.  What would it depend on? |
| 10     A.  It would depend on looking at that |
| 11 person's time and seeing that they might have |
| 12 called in sick every Sunday.  There are so many |
| 13 reasons. |
| 14     Q.  So would it be based on — what if they |
| 15 hadn't had any problems before, would it be a |
| 16 situation where you would still? |
| 17     A.  I'm really don't know.  I'm not sure |
| 18 what you're — |
| 19     Q.  Well, my point is this, do you generally |
| 20 have to — before you start asking for |
| 21 documentation, you generally have to identify a |
| 22 problem? |
| 23     A.  If somebody calls in sick, it's a |
| 24 problem. |

9 (Pages 30 to 33)

**RUTH NATHANS**
**May 19, 2006**

| Page 34 | Page 36 |
|---|---|
| 1    Q. Say if I call in sick and it's the first | 1    Q. Yes. Any meetings where she brought any |
| 2  time I've ever called in sick, and I haven't had | 2  concerns to you or another member of the Hogan |
| 3  any problems, would you ask me for a medical | 3  Resource Center? |
| 4  documentation? | 4    A. I don't remember anything in writing |
| 5    A. Off the top of my head, I can't think | 5  from Diane. |
| 6  that we would. | 6    Q. Well, not in writing. |
| 7    Q. Normally, it's when you notice a pattern | 7    A. But that's how I would remember. |
| 8  of improper use of sick leave that you start asking | 8    Q. I see. Are you familiar with Derek |
| 9  for medical documentation? | 9  Jones at all? |
| 10    A. On occasion, but there are others. I | 10    A. Yes. |
| 11  mean, there are so many other reasons. | 11    Q. Do you know why he was terminated? |
| 12    Q. Is this generally something you would | 12    A. I don't remember. |
| 13  warn an employee about before you start asking for | 13    Q. Are you aware that he sued Hogan |
| 14  medical documentation? | 14  Resource Center? |
| 15    A. On occasion, yes. I'm sure that when | 15    A. Only after it was all done. |
| 16  checking with Human Resources, they would say, Go | 16    Q. Are you aware of why he sued Hogan |
| 17  ahead and ask for it. | 17  Resource Center? |
| 18    Q. Without any verbal counseling of any | 18    A. What was the outcome of that? |
| 19  kind? | 19    Q. I don't know. |
| 20    A. And we do check with Human Resources | 20    A. I don't remember. |
| 21  before we do things. | 21    Q. Were there any discussions at Hogan |
| 22    Q. Do you recall checking with Human | 22  Resource Center about Derek Jones's case? |
| 23  Resources prior to requesting documentation from | 23    A. With me, no. |
| 24  Diane Lackiram? | 24    Q. With anyone? |

| Page 35 | Page 37 |
|---|---|
| 1    A. I really don't remember. | 1    A. I don't remember anybody discussing |
| 2    Q. Is there anything that would refresh | 2  Derek Jones. |
| 3  your memory? | 3    Q. In October 2003, Ms. Lackiram was |
| 4    A. Unless they have some documentation of | 4  brought up on charges of workplace violence, right? |
| 5  my asking or one of the assistants asking. | 5    A. I vaguely remember. |
| 6    Q. I may have covered this and I apologize | 6    Q. Do you remember the allegations? |
| 7  if I did. Regarding the improper use of the | 7    A. No, I don't. |
| 8  telephone alleged against Ms. Lackiram, there was a | 8    Q. Did you participate in the investigation |
| 9  meeting about that on July 31st, right? | 9  in any way? |
| 10    A. I don't remember the dates. | 10    A. No. |
| 11    Q. You went to a meeting though, right, | 11    Q. Who would do that? |
| 12  about this improper use of a phone? | 12    A. That would go to Human Resources. |
| 13    A. I really don't remember. | 13    Q. Faith Kirkland? |
| 14    Q. Do you remember any meetings with Diane | 14    A. To Faith. What we would have done, and |
| 15  Lackiram where other staff managers were present? | 15  I don't know what she did, was probably separate |
| 16    A. Well, she used to come to supervisors | 16  the folks. |
| 17  meetings. | 17    Q. In March of 2004, Diane Lackiram was |
| 18    Q. Okay. What else? | 18  charged with workplace violence. Did you have any |
| 19    A. That's the only meeting that I could | 19  role in that at all? |
| 20  think of that everybody would be at. | 20    A. When was that? |
| 21    Q. You don't recall any other meeting with | 21    Q. March of 2004. Did you have any role in |
| 22  supervisors where Diane was present — I'm sorry. | 22  the investigation in that? |
| 23  Managers, not supervisors? | 23    A. March of 2004, I was retired. |
| 24    A. With managers? | 24    Q. Do you recall getting a phone call at |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# RUTH NATHANS
## May 19, 2006

|   | Page 38 |
|---|---|
| 1 | home from Diane Lackiram? |
| 2 | A.  At home? |
| 3 | Q.  Yes. |
| 4 | A.  No. |
| 5 | Q.  About workplace violence charges? |
| 6 | A.  No. |
| 7 | Q.  Have you had any conversations with |
| 8 | Diane Lackiram since you stopped working at Hogan |
| 9 | Resource Center? |
| 10 | A.  No. |
| 11 | Q.  Have you had any conversation with |
| 12 | anyone, except your attorney, regarding Diane |
| 13 | Lackiram? |
| 14 | A.  At this point, no. |
| 15 | Q.  You said you're in charge of the day-to- |
| 16 | day operations of Hogan Resource Center, right? |
| 17 | A.  Of one division. |
| 18 | Q.  One division.  In that regard you often |
| 19 | reviewed employee attendance? |
| 20 | A.  Not as much.  The assistants usually did |
| 21 | most of that. |
| 22 | Q.  But you were in charge of deciding who |
| 23 | would be disciplined for attendance violations, |
| 24 | right? |

|   | Page 40 |
|---|---|
| 1 | disciplining anyone for attendance at any point in |
| 2 | the year 2002 or 2003? |
| 3 | A.  Disciplining them about what? |
| 4 | Q.  For missing too much work. |
| 5 | A.  Truthfully, no.  There are other -- |
| 6 | MR. WYZANSKI:  You don't remember or you |
| 7 | don't know? |
| 8 | Q.  You don't remember, or it didn't happen? |
| 9 | A.  I don't remember. |
| 10 | Q.  So you have no particular recollection |
| 11 | of anyone having any attendance issues in 2002 or |
| 12 | 2003? |
| 13 | A.  No, I don't remember. |
| 14 | MR. TUMPOSKY:  That will do it. |
| 15 | MR. WYZANSKI:  I have no questions. |
| 16 | MR. TUMPOSKY:  The only thing I'll say |
| 17 | is I requested certain documentation.  I'm |
| 18 | assuming it doesn't exist, but there has been |
| 19 | some reference to notes and things of that |
| 20 | sort, if for some reason they are in |
| 21 | existence, I would just like to reserve the |
| 22 | right to reopen these depositions to exam the |
| 23 | documentation that have yet to be produced. |
| 24 | MR. WYZANSKI:  Any specific notes you're |

|   | Page 39 |
|---|---|
| 1 | A.  No. |
| 2 | Q.  Who would do that? |
| 3 | A.  The assistant would bring it up, and it |
| 4 | would go to Human Resources if necessary. |
| 5 | Q.  Prior to April of 2003, do you ever |
| 6 | recall disciplining Diane Lackiram for attendance |
| 7 | issues? |
| 8 | A.  There would be documentation.  I don't |
| 9 | remember. |
| 10 | Q.  So if there isn't documentation, then to |
| 11 | your knowledge, it didn't happen? |
| 12 | A.  I would have no record of it.  I would |
| 13 | have no understanding of it. |
| 14 | Q.  Do you recall disciplining someone named |
| 15 | Jessica Mason for attendance issues in January of |
| 16 | 2003? |
| 17 | A.  No. |
| 18 | Q.  Do you recall disciplining anyone for |
| 19 | attendance issues in January of 2003? |
| 20 | A.  No, I really don't. |
| 21 | Q.  I suppose that's not fair. |
| 22 | A.  You got it. |
| 23 | MR. WYZANSKI:  You got it. |
| 24 | Q.  Let me put it this way.  Do you remember |

|   | Page 41 |
|---|---|
| 1 | talking about? |
| 2 | MR. TUMPOSKY:  Any disciplinary stuff |
| 3 | that took place before the documentation, you |
| 4 | know, for the dates for which we have |
| 5 | documentation for. |
| 6 | MR. WYZANSKI:  You mean the Fernald |
| 7 | School? |
| 8 | MR. TUMPOSKY:  No, no.  I mean, 2002 to |
| 9 | 2003 at Hogan.  There has been some mention |
| 10 | that stuff happened before and people wanted |
| 11 | to check their notes, if that does end up |
| 12 | popping up, I just want to reserve the right |
| 13 | to reopen on that limited basis.  Other than |
| 14 | that, that's all I've got. |
| 15 | MR. WYZANSKI:  Thank you.  I have no |
| 16 | questions. |
| 17 |  |
| 18 | (Deposition suspended at 2:10 p.m.) |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**RUTH NATHANS**
**May 19, 2006**

---

Page 42

1    COMMONWEALTH OF MASSACHUSETTS
2        I, ELAINE HURLEY, a Notary Public in and
3    for the Commonwealth of Massachusetts, do hereby
4    certify that RUTH NATHANS appeared before me, on
5    the 19th day of May, 2006 and was by me duly sworn
6    to testify to the truth and nothing but the truth
7    as to her knowledge touching and concerning the
8    matters in controversy in this cause; that she was
9    thereupon examined upon her oath and said
10   examination reduced to writing by me; and that the
11   statement is a true record of the testimony given
12   by the witness, to the best of my knowledge and
13   ability.
14       I further certify that I am not a
15   relative or employee of counsel/attorney for any of
16   the parties, nor a relative or employee of such
17   parties, nor am I financially interested in the
18   outcome of the action.
19       WITNESS MY HAND this 8th day of June,
20   2006.
21
22   Elaine Hurley        My Commission expires:
23   Notary Public        April 7, 2011
24   Today's date:        June 6, 2006

---

Page 44

1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3            C.A. No. 04-12592-GAO
4    ****************************************
5    DIANE LACKIRAM,              *
6        Plaintiff,               *
7    v.                           *
8    LINDA MONTMINY, PAT MCCARTHY,        *
9    FAITH KIRKLAND, ROSEMARY BEVINS,     *
10   RUTH NATHANS, LEILA SARKIS, et. al.  *
11       Defendants.              *
12   ****************************************
13
14       I, RUTH NATHANS, do hereby certify,
15   under the pains and penalties of perjury, that the
16   foregoing testimony is true and accurate, to the
17   best of my knowledge and belief.
18       WITNESS MY HAND, this     day of    ,
19   2006.
20
21   _____
22            RUTH NATHANS
23
24

---

Page 43

1    Today's date:      June 8, 2006
2    To:               Charles M. Wyzanski, Esq.
3    Copied to:        Michael Tumposky, Esq.
4    From:             Elaine Hurley
5    Deposition of:    Ruth Nathans
6    Taken:            May 19, 2006
7    Action:           DIANE LACKIRAM vs.
8                      LINDA MONTMINY, et. al.
9
10       Enclosed is the deposition of RUTH
11   NATHANS. Please have Ms. Nathans sign the enclosed
12   signature page. If there are any errors, please
13   have her mark the page, line and error on the
14   enclosed correction sheet. She should not mark the
15   transcript itself. This addendum should be
16   forwarded to all interested parties.
17       Thank you for your cooperation in this
18   matter.
19
20
21
22
23
24

---

Page 45

1            CORRECTION SHEET
2
3    DEPONENT:      RUTH NATHANS
4    CASE:        Diane Lackiram v.
5                 Linda Montminy, et. al.
6    DATE TAKEN:   May 19, 2006
7    ****************************************************
8    PAGE / LINE / CHANGE OR CORRECTION AND REASON
9    ****************************************************
10   ___/___/_____
11   ___/___/_____
12   ___/___/_____
13   ___/___/_____
14   ___/___/_____
15   ___/___/_____
16   ___/___/_____
17   ___/___/_____
18   ___/___/_____
19   ___/___/_____
20   ___/___/_____
21   ___/___/_____
22   ___/___/_____
23   ___/___/_____
24   ___/___/_____

---

12 (Pages 42 to 45)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**